567 So.2d 200 (1990)
Ollie SYKES, James R. Figgs and Paul Carter
v.
Linda GRANTHAM and The Travelers Insurance Company.
No. 89-CA-0003.
Supreme Court of Mississippi.
August 8, 1990.
Robert L. Gibbs, Deputy Atty. Gen., Mike C. Moore, Atty. Gen. Jackson, for appellants.
Alvin Binder, Lisa B. Milner, Binder Milner & Milner, Gary K. Jones, Daniel Coker Horton & Bell, Jackson, for appellees.
En Banc.
ROY NOBLE LEE, Chief Justice, for the Court:
This case appears before the Court for the second time. On the first trial in the Circuit Court of Hinds County, Mississippi, the Honorable William F. Coleman dismissed the complaint for failure to state a claim upon which relief could be granted and an appeal was taken here. The judgment of the lower court was affirmed as to the Parole Board, Department of Corrections and Commissioner of Corrections. The judgment was reversed and remanded for trial as to the individual Parole Board Members. Grantham v. Dept. of Corrections, 522 So.2d 219 (Miss. 1988).
*201 After a second trial, the jury returned a verdict for Grantham in the sum of $2,500,000.00 actual damages and $500,000.00 punitive damages, and judgment was entered for those amounts. The Parole Board members have appealed to this Court. We consider one (1) issue and reverse and render the judgment of the lower court.

PART I
HAWKINS, Presiding Justice, for the Court:

FACTS
Pursuant to Miss. Code Ann. § 47-7-5 (1984 Supp.), Ch. 471, Laws, 1984), in July, 1984, the following were appointed to the State Parole Board:
1. James Russell Figgs of Marks, a paralegal, formerly employed with the Mississippi Rural Legal Services.
2. Ollie Vivian Sykes of Meridian, media coordinator for the Meridian Public School Systems.
3. Paul Carter of Vancleave, assistant director of personnel and employee relations for the Singing River Hospital System of Jackson County.
4. B.C. Ruth of Ruleville, chairman, and long-time employee at the state penitentiary in Parchman, employed as Director of Records for the Parole Board.
5. Jo Ann Kaelin of Gloster.
Under the Act only the chairman was a full-time employee; the others were only paid a per diem and necessary expenses while attending board meetings. The board met three-to-four days each month.
On Tuesday, December 18, 1984, in a meeting which began at 8:00 a.m. and concluded at 5:30 p.m., the board considered parole for sixty-three convicts, among whom was Clem V. Jimpson. Fifteen applicants, including Jimpson, were granted parole.
None of the board members, other than Ruth, had any knowledge of Jimpson prior to this day.
Ruth began working at Parchman on August 18, 1948, and worked there for a few years. Thereafter in 1960 he returned to Parchman as the records officer, where he remained until he became chairman of the Parole Board in July of 1984. He retired in July of 1988. Ruth's prior knowledge of Jimpson was limited to Jimpson's record.
Ruth testified that he had to leave the Board meeting for "some reason", but did not recall whether Jimpson was present when he left, and also that prior to leaving the room, he told the other three Board members that he could not go along with paroling Jimpson. He gave no reason for his opinion. When Ruth returned to the meeting 10 to 20 minutes later, Jimpson was present and the decision had been made to grant his parole.
Ruth stated that although it was not unusual for him not to go along with a decision of the other members to grant parole, he thought that the other Board members heard his comment concerning Jimpson's parole. He added, "At one point in time, Mr. Figgs in a conversation did say that he heard me say that." However, Figgs did not acknowledge the comment at the time it was made. Figgs and Carter in their testimony did not recall Ruth's expressing opposition to the parole of Jimpson, but testified he had for some reason or another left the room when Jimpson's parole was considered.
Ruth admitted on cross-examination that he probably would have voted for Jimpson's parole had he not been privy to Jimpson's past record at Parchman as the records director. While administrative assistant Ruth signed a form denying Jimpson's parole on March 2, 1984. The form indicated that it was not in the best interest of society to parole Jimpson.
Ruth gave Carter the chairman's parole file prior to leaving the room. He added that Figgs looked at the master file for several minutes, while he and the other two members talked with at least two other prisoners.
Ruth stated that it was the duty of the Records Department at the Department of Corrections to forward the community acceptance forms to the proper judges and *202 district attorneys. He acknowledged that the Department of Corrections and the Mississippi Parole Board were separate entities.
In any event, Ruth's views as to Jimpson were neither considered nor sought by the remaining board members.
The board had available to it for study the entire prison records of each applicant, which frequently, as in Jimpson's case, consisted of a thick, voluminous file. There was also prepared by the staff of the department of corrections on each parole applicant a "chairman's file," consisting of copies of what was considered pertinent information:
(1) letters from sponsoring groups;
(2) Early Release Risk Evaluation or matrix evaluation;[1]
(3) copies of rule violations reports (RVRs); and
(4) community attitude reports.
Because Ruth was not in the room when Jimpson's parole was considered, Carter, as acting chairman, reviewed the chairman's file.
Some applicants were personally interviewed by the board. While the board was conducting the interview of one applicant, one of its members would review the complete prison file of the applicant to follow. Thus, Figgs, as Sykes put it, browsed, and as Carter put it, thumbed, skipped through and reviewed Jimpson's prison file while the other board members interviewed two other applicants. It was estimated that approximately fifteen to twenty minutes was spent by Figgs in examining Jimpson's file, and another fifteen minutes was spent by the board in the actual interview of Jimpson.
No other member of the board examined the prison file on Jimpson, and the other board members' knowledge of Jimpson's record was limited to what Figgs reported was contained in this file. Carter did have the chairman's file to compare with what Figgs related, but he never testified what effect, if any, the information in the chairman's file had upon his decision.
Mary Ruth Maxwell, assistant director of the alcohol and drug rehabilitation center at Parchman, accompanied Jimpson at his interview, and she recommended parole. She did not testify at trial.
Carter did not recall whether the 1984 Early Release Risk Evaluation (also referred to as the Matrix Evaluation) was in the file.
It is not clear from the trial record what Figgs related to Sykes and Carter as to Jimpson's prison record. Figgs testified repeatedly that he gave the other two all the "pertinent" information, but he never specified what he told them.
Figgs did consider an Early Release Risk Evaluation prepared February 16, 1983. An Early Release Risk Evaluation is a form prepared by a member of the staff of the department of corrections following an interview with the prisoner and a guard acquainted with him. It takes into account prior convictions, prior parole or release violations, types of criminal convictions, RVRs, institutional training, personal relations and societal interactions, attitude, emotional and mental stability, preparations or plans following release, and a score is given on each of these categories. On the 1983 forms a low score is 0-13, 10-14 is low medium, 15-18 is high medium, and 19-38 is high. A low to low medium is favorable to a parole. A high medium or high score indicates the prisoner should remain until the completion of his sentence. The 1983 evaluation gives Jimpson a total score of 7. Figgs testified he told the members of this report.
Figgs also considered that at the February 29, 1984, meeting of the previous parole *203 board, it had denied and continued Jimpson's application for nine months, which to him indicated that if in the ensuing interim his behavior was satisfactory, his application for parole should be favorably considered.
Also in the file was a psychological assessment and profile made by a prison psychologist on March 21, 1979. This test indicated Jimpson should not be considered for parole. The examiner found psychotic thinking, an alienation from people, and a high susceptibility to alcohol or drug abuse. Figgs testified that he told the other board members of this report, but they denied it.
Figgs also told the other board members that Jimpson had not had any rule violations in three and one-half years prior to their meeting.
Figgs testified that the board considered a community comment form from Quitman County and the years Jimpson had been in prison.
Figgs testified that he had told the other board members of Jimpson's convictions and prison record, but as above noted, he gave no specifics.
The board also had before it a letter from an organization called "Friends of Alcoholics," or FOA, in Pocahontas, Hinds County, dated May 25, 1984, agreeing to sponsor Jimpson as an inmate for a four to six months' treatment, after which the organization would assist him in obtaining employment. Under the proposal Jimpson would have to remain at the facility for two months, following which he could have a pass to visit his immediate family only.
The other two board members, Sykes and Carter, had no recollection of being told of an Early Release Risk Evaluation prepared January 25, 1984, in which Jimpson scored 18, with 18-29 on this evaluation form being considered a high score. It is not clear that Figgs saw or considered this report, himself.
After stating that he informed Carter and Sykes of the 1984 Risk Evaluation form, Figgs said:
I told them of the pertinent information that I reviewed and what I had considered and, if this is in the documents, then I told them.
Carter had no recollection of any discussion concerning Jimpson's high risk score on the 1984 Risk Evaluation. He admitted having relied upon the 1983 Risk Evaluation, which contained a low risk factor. In an attempt to explain why he relied upon the 1983 Risk Evaluation (evincing a low risk) rather than the 1984 Risk Evaluation, he stated a risk evaluation form is not done every time a prisoner is submitted for parole and that there is usually only one such form in a file. Carter stated that he did not recall whether the 1984 Early Release Risk Evaluation was in the file.
Concerning the discussion of Jimpson's Risk Evaluations, Sykes stated that she discovered, after the deposition, that the psychological test referred to by Figgs during the meeting, was actually the 1983 Risk Evaluation form, which contained several errors. She admitted that had she seen the 1984 Risk Evaluation form, she would certainly have considered it. The 1984 evaluation would have been even higher if accurate information had been given, because it gave Jimpson a zero on use of alcohol, and a zero on parole violations, in both of which categories Jimpson, as will be noted below, should have significantly scored.
Clem V. Jimpson was born on January 25, 1928, and had an eighth grade education. A summary of Jimpson's criminal record and prison record which was available in the prison file shows the following:
1.) On December 16, 1947, he was convicted of Robbery in Hinds County, Mississippi and received a seven (7) year sentence. He was admitted to Parchman on December 26, 1947 and discharged on May 4, 1953.
2.) On December 16, 1953, he was convicted in Harrison County for Assault and Battery with Intent to Murder, Burglary, and Burglary & Larceny and sentenced to three (3) years on each count to run concurrently. He was re-admitted to Parchman on January 22, 1954 and discharged on July 28, 1956.

*204 3.) On December 7, 1956, he was convicted in Hinds County for Burglary and Larceny and sentenced to ten (10) years on each count to run concurrently. He was re-admitted on December 26, 1956. The record does not reflect the date of his discharge.
4.) On July 10, 1959, he escaped, but was returned to Parchman that same day. On September 21, 1959, he was convicted for the escape and sentenced to an additional (1) year.
5.) Although the record does not reflect the previous date of discharge, he was convicted in Quitman County on February 14, 1963 for Burglary and sentenced to three (3) years. The record does not reflect the date of discharge.
6.) On May 29, 1964, he escaped. The record does not reflect the sentence, nor the date of discharge.
7.) Although the record does not reflect the previous date of discharge, on December 7, 1972, he was convicted in Hinds County for the Murder of a convenience store clerk and sentenced to life. He returned to Parchman on December 18, 1972.
8.) On January 5, 1973, he escaped, only to be returned on that same date. The record does not reflect any sentence therefore.
9.) On May 28, 1973, he escaped again and was returned on May 30, 1973. The record does not reflect any sentence therefore.
10.) On November 30, 1978, at approximately 12:45 p.m., during a "unit shake-down," Jimpson was found in possession of five gallons of "buck" [liquor]. On the RVR form the offense was classified as a "serious violation." On December 19, 1978, the Disciplinary Committee (hereinafter referred as the Committee) sentenced Jimpson to "loss of 50 earned time days" and "10 isolation days."
11.) On November 30, 1978, at approximately 1:30 p.m., Jimpson was restrained by guards after having hit another prisoner in the face several times with his fist. On the RVR form the offense was classified as a "serious violation." On December 12, 1978, the Disciplinary Committee's recommendation was to sentence him to "loss of 50 earned time days (suspending 30 days good behavior)," "two interviews with a mental health counselor," and that he be reclassified. On January 23, 1979, the Classification Director reviewed the Committee's recommendation for the reclassification of Jimpson, but there was no class change. Jimpson remained in "C" custody, "1" class, and in Camp # 24.[2]
12.) On May 30, 1979, at Jimpson's request, he was assigned to work as a clerk in the law library. The Classification Director changed Jimpson from "B" custody to "A" custody, he remained in "1" class, and was transferred to Camp # 3.
13.) On June 29, 1979, Jim Norris filed a report requesting that Jimpson not return to the law library, which stated:
[H]e [Jimpson] is very unconcerned about his work, he doesn't try to do it. He is very hard to work with and working ability is very poor. He doesn't feel that he has to work. He does a great deal of just wasting time and does not feel that he is obligated to do his work. He is insufficient and unreliable.
As a result of Norris's request, on June 25, 1979, Jimpson was no longer allowed to work in the law library. He was transferred from Camp # 3 to Camp # 25, yet remained in "A" custody and "1" class.
14.) On July 19, 1979, Jimpson was caught swinging at another inmate with a homemade knife, which he finally threw under a "bunk" after several requests by a guard. On the RVR form the offense was classified as a "serious violation." On August 15, 1979, the Committee recommended *205 that Jimpson be sentenced to the loss of 100 "earned days," 10 "isolation days," and a reduction in custody (A to C) and class (1 to 4). On August 16, 1979, the recommendation was accepted to reduce Jimpson's custody from A to C and class from 1 to 4.
15.) On January 6, 1980, Jimpson was found to be intoxicated. The RVR form indicates that this was a "serious offense." On January 7, 1980, the Classification Director transferred Jimpson from Camp # 12 to # 23. On January 23, 1980, the Committee sentenced him to the loss of 100 days earned time and a reduction in custody from A to C.
16.) On July 10, 1980, an "Administrative Detention Application" was filed indicating that Jimpson was found in Unit 23 to be in possession of car keys belonging to a guard. The finding was that Jimpson was an escape risk. On July 11, 1980, the classification director reduced Jimpson from "B" custody to "C" custody, from class 1 to 4, and transferred him from Unit # 23 to the MSU (presumably meaning Maximum Security Unit).
17.) On May 20, 1981, the Classification Director approved a reclassification request reducing Jimpson from custody A to C, from class 1 to 4, and 10 days isolation. The classification form was not accompanied by an RVR form and the record does not reflect any reason for this reclassification.
18.) On July 24, 1981, the Classification Director confined Jimpson to quarters from the general population in Unit # 24, for the following justification:
That on 7-21-81, inmate Jimpson was found to be possessing a home made knife in his cell in C-Housing Unit. Inmate Jimpson should be confined pending disciplinary action. (E. 6)
The record does not contain an RVR form, which exhibits the disciplinary action. There is no indication in the record as to any subsequent disciplinary action taken, concerning this incident.
19.) The 1983 Early Release Risk Evaluation, dated February 16, 1983, indicated that Jimpson was a low risk as a parole violator.[3]
The total Risk score and the total Needs score on the 1983 Early Release Risk Evaluation were calculated by use of a Matrix Evaluation Form attached thereto. The total Risk score was divided into four categories: (1) Low (0-9); (2) Low Medium (10-14); (3) High Medium (15-18); and (4) High (19-38). The total Needs score is also divided into four categories: (1) Low (0-13); (2) Low Medium (14-18); (3) High Medium (19-28); and (4) High (29-48).
The Risk score and Needs score were combined into the Matrix Evaluation Form, which in turn was divided into four matrix levels. Level one (Low) indicated that the inmate was a candidate for "forced release." Level two (Low Medium) indicated that the inmate was a candidate for work release. Levels three and four (High Medium and High) indicate that the inmate *206 should remain in the institution until completion of sentence.
20.) On September 24, 1983, at approximately 1455 hours, Jimpson shouted profanities at a guard for approximately two minutes. The RVR form indicates that this was a "serious offense". The Unit Administrator of Unit # 24, wrote:
That on the above date inmate Clim Jimpson did use abusive language towards this writer, was intoxicated also. Inmate Jimpson has been a management problem at Unit # 24 for a very long time and has been involved in several serious incidents here. Inmate Jimpson should be moved for the safety and protection of inmates and officers at Unit # 24, and also pending disciplinary action.
On November 9, 1983, the Classification Director sentenced Jimpson to 20 days isolation.
21.) On September 24, 1983, at approximately 1505 hours, a plastic container, which contained the residue of "buck" [liquor], was found under Jimpson's bed. The RVR form indicated that this was a "serious offense". The Unit Administrator of Unit # 24 commented upon this incident:
That on the above date and at appr. 1445 hrs, inmate Clim Jimpson used abusive language towards this writer. He was also intoxicated on this date. Inmate Jimpson has been a major management problem at Unit # 24 for some time and should be moved to Unit # 27 pending disciplinary action and for the safety and protection of officers and inmates at Unit # 24.
Jimpson was said to smell of alcohol with red eyes and blurred speech. The guard concluded and Jimpson admitted that he was intoxicated. On October 5, 1983, Jimpson was reduced from custody A to C, yet he remained in Unit # 24. The Committee confined Jimpson to 29-A building pending disciplinary action.
22.) On January 18, 1984, apparently at Jimpson's request, the following report was made:
That on the above date and at appr. 0950 hrs, inmate Clim Jimpson stated to this writer that if he was not moved away from Unit 24 complex, even to a lock-down unit, he was going to have to be moved because he was going to hurt somebody. Inmate Jimpson should be re-housed to Unit # 27 pending reclassification and also for the safety and protection of other inmates housed at Unit # 24 complex.
On January 18, 1984, Jimpson was moved to Unit # 27. On January 19, 1984, Committee Chairman, Richard L. Jefferson, in the "Findings of Classification Committee", wrote:
Offender denied allegations, states he just asked to be rehoused, stated he did not receive a RVR, does not want to be rehoused to Unit 24. He and the Unit Administrator had conflicts. Appeared to be open  no observant abnormal behaviors. Hold for Review periodically.
On January 20, 1984, the Classification Director reduced Jimpson custody from A to C. Following the "C" was the designation (Temp), this apparently indicates that the transfer was temporary. He was classified as "4."
23.) The 1984 Early Release Risk Evaluation, dated January 25, 1984, indicated that Jimpson was a High Medium risk as a parole violator. The evaluation was prepared by Herman D. Parker, Jimpson's Unit Administrator and Richard L. Jefferson, Jimpson's Case Manager.[4]
The total Risk score and the total Needs score on the 1984 Early Release Risk Evaluation were also calculated by use of a Matrix Evaluation Form; however, the scale was changed subsequent to the 1983 evaluation. The 1984 total Risk score was divided into four categories: (1) Low (0-5); (2) Low *207 Medium (6-10); (3) High Medium (11-17); and (4) High (18-29). The total Needs score was also divided into four categories: (1) Low (1-6); (2) Low Medium (7-12); (3) High Medium (13-22); and (4) High (23-49).
The Risk score and Needs score were combined in the Matrix Evaluation Form, which in turn was divided into four matrix levels. Level one (Low) indicated that the inmate was a candidate for early release consideration. Level two (Low Medium) indicated that the inmate was a candidate for work release. Levels three and four (High Medium and High) stated that the inmate should remain in the institution until completion of sentence.
On the 1984 Early Release Evaluation, Jimpson had a total Risk score of 18 and a total Needs score of 11.[5]
24.) On February 20, 1984, although the classification form indicated that Jimpson was deemed to be a management problem on 1-18-84, the Classification Director raised Jimpson's custody rating from C to A and transferred him from Unit 27 to 7. Jimpson was also classified "1".
25.) On March 19, 1984, the unit administrator of unit # 4 filed a report, stating, "Need to move this inmate before trouble starts for I am not putting up with his ways."
On June 14, 1984, the Request For Reclassification was stamped "Disapproved" by the Classification Director.
The board members did not talk with any guard or supervisory personnel who were personally acquainted with Jimpson, and who knew something about his personality or character traits (what Maxwell knew or did not know is conjecture). Another important factor which seems to have been ignored by the board was the length of time Jimpson was out of prison on previous releases until he was arrested upon a subsequent charge and returned to prison. Indeed, here the prison record leaves much to be desired. For example:
1.) Jimpson's date of discharge after he served his 1956 conviction was not in the record;
2.) The record does not reveal whether or not Jimpson was out on parole when he committed the burglary for which he was convicted in 1963; and
3.) The record is unclear as to how long Jimpson was out prior to the murder for which he was convicted on December 7, 1971.
What Figgs actually saw of this record or the weight he gave it is a matter of conjecture. Clearly, the vast bulk of this information was not revealed to the other board members. None of the other board members testified they sought advice or information from him as to Jimpson. Ruth was the only member of the board who knew something of Jimpson's record prior to that day, and he, of course, knew a good deal, having been an employee at Parchman as Director of Records for the Parole Board for a number of years.
*208 Jimpson was released from Parchman on January 9, 1985, on a conditional parole on condition that he complete the six-month alcohol rehabilitation program at FOA, and he reported to Pocahontas on January 11.
Richard C. Barth, a minister, was director of FOA. He testified FOA was on a 76-acre tract, operated on principles of Christianity, and parolees stayed with them four-to-six months. He accepted Jimpson as an inmate because of the entreaties of a woman he assumed was Jimpson's wife (he learned later she was not). His organization made no investigation of Jimpson, and knew nothing about whether or not he was a good parole risk.
Jimpson was a model inmate for the first three and one-half weeks, according to Barth. Then, Barth got a call "from one of the news media" asking him if Jimpson was there. Barth would give no information. Because inmates could receive telephone calls, upon a restricted basis, a call to Jimpson was received by him. Barth said that following this Jimpson went downhill. All told he got three to four calls, and after each one he would become agitated. He became nervous and started having asthma attacks. Jimpson left without leave on February 9. Barth reported this to the sheriff's office and the parole office. FOA had no guards or security system.
On February 12, in an attempt at the parking lot of the Raymond-Terry Road branch of the Deposit Guaranty National Bank to kidnap Linda Grantham, an employee at the bank, he shot her. The bullet entered the base of her skull, rendering her a quadriplegic.
On March 25, 1985, Grantham filed suit in the circuit court of the First Judicial District of Hinds County against all five parole board members individually and in their official capacities, against Morris Thigpen, individually and as former official capacity as commissioner of the department of corrections. The action was dismissed as to all defendants under Rule 12(b) Motion to Dismiss, Mississippi Rules of Civil Procedure (MRCP). Upon appeal, under the doctrine of sovereign immunity, we affirmed as to Thigpen and as to the parole board members in their official capacities. Grantham v. Department of Corrections, 522 So.2d 219 (Miss. 1988). We reversed the dismissal as to the parole board members individually.
Upon remand the cause was dismissed as to Ruth because he did not vote for Jimpson's release and was out of the room when the decision was made, and dismissed as to Kaelin because she was absent from the board meeting on December 18, 1984.
The cause proceeded to trial, resulting in a jury verdict in favor of Grantham against Figgs, Sykes and Carter in the amount of $2.5 million actual damages, and $500,000 punitive damages. Travelers Insurance Company, as Grantham's workers' compensation carrier, is subrogated to the amount of $624,833.40.
The defendants have appealed.

PART II
ROY NOBLE LEE, Chief Justice, for the Court:

LAW
The sole issue addressed in this discussion is whether or not the lower court erred in denying appellant's motion for judgment notwithstanding the verdict.
Miss. Code Ann. § 47-7-17 (Supp. 1984) sets out the duties and responsibilities of the state parole board, which is composed of five (5) members. The section provides in part:
Within one (1) year after his admission and at such intervals thereafter as it may determine, the board shall secure and consider all pertinent information regarding each offender, ... including the circumstances of his offense, his previous social history and criminal record, his conduct, employment and attitude while in the custody of the department, and the reports of such physical and mental examinations as have been made... .
Before ruling on the application for parole of any offender, the board may have the offender appear before it and interview him... . A parole shall be ordered *209 only for the best interest of society, not as an award of clemency; it shall not be considered to be a reduction of sentence or pardon. An offender shall be placed on parole only when the arrangements have been made for his proper employment or for his maintenance and care, and when the board believes that he is able and willing to fulfill the obligations of a law-biding citizen... .
Miss. Code Ann. § 47-7-5 (Supp. 1984) contains the following provision:
The board shall employ no staff personnel, any staff personnel shall be provided by the Department of Corrections.[6]
Parole board members were appointed for a period of four (4) years, the terms of office to begin July 1, 1976. Section 47-7-5 provided that only persons, who by knowledge and experience, are prepared to perform efficiently the duties of the board, as stated above, shall be eligible for appointment. The chairman of the parole board was paid an annual salary established by the legislature and each board member, other than the chairman, received only per diem, mileage and necessary expenses while attending meetings of the parole board.
Of the five board members, at the time this action occurred, only James Russell Figgs, Ollie Vivian Sykes, and Paul Carter remain in the suit. Jo Ann Kaelin was absent on the day Jimpson's case was considered and Chairman B.C. Ruth, the only person knowledgeable about criminal and parole matters, for some unexplained reason, excused himself from the room at the time of the consideration. Figgs was a paralegal from Marks; Sykes was a media coordinator for the Meridian Public School Systems; and Paul Carter of Vancleave was assistant director of personnel and employee relations for the Singing River Hospital System of Jackson County. The board was appointed by the Governor on July 1, 1983, and had been in office six months at the time the application of Jimpson was considered and action taken thereon, December 18, 1984.
It is obvious from the record that these three appellants against whom judgment was entered in the lower court for $3,000,000 were unlearned, unskilled, not trained and un-knowledgeable about the complex and sensitive task, which the State of Mississippi had summarily thrown into their laps. They were required to perform that task to the best of their ability and judgment, using such tools as the State of Mississippi and the law had provided them. In Grantham v. Dept. of Corrections, 522 So.2d 219 (Miss. 1988), [Hereinafter Grantham-I] we said:
Today's appeal arises from a tragedy that touches the heart and sears the soul of our parole system, yet we confront the reality that the system may not be sued. We know that possibility of parole is an indispensable part of a correctional policy with any hope of doing more good than harm. To the prisoner possibility of parole is hope itself. As well, we know the painful lesson of recidivism: that among those paroled it is a statistical certainty that some will strike again, if only we could know which ones.
Our state corrections and parole officials function within the tension of these polar realities. Their jobs in part are guided by statutes. Our law has long afforded substantial immunities to these officials in the face of plaintiff's pleadings, and with good reason. Only where they act with gross disregard for the safety of society or in clear violation of statutory directive may they be charged to answer at the bar of civil justice.
* * * * * *
The last thing our poorly paid and heavily burdened correctional and parole officials need is more lawsuits. Yet the system they administer will inevitably produce great injury.
Grantham, 522 So.2d at 220, 223.
We review and reiterate the meanings of ministerial and discretionary functions and *210 qualified immunity arising to officers by virtue of them. In Poyner v. Gilmore, 171 Miss. 859, 158 So. 922 (1935), the Court stated:
"The most important criterion, perhaps, is that (if) the duty is one which has been positively imposed by law and its performance required at a time and in a manner or upon conditions which are specifically designated, the duty to perform under the conditions specified not being dependent upon the officer's judgment or discretion," the act and discharge thereof is ministerial.
Poyner, 171 Miss. at 865, 158 So. at 923; quoting Mechem on Public Officers, § 657 at p. 442 (1890).
Davis v. Little, 362 So.2d 642 (Miss. 1978) discusses the question in the following language:
The immunity of public officials, on the other hand, is a more limited principle, since its purpose is not directly to protect the sovereign, but rather to do so only collaterally, by protecting the public official in the performance of his governmental function. Given the more limited function, courts have generally extended less than absolute immunity. The most commonly recognized limitation is the distinction between discretionary acts as opposed to ministerial acts. Under this distinction the official is immune only where that which he does in the performance of his lawful duties requires "personal deliberation, decision and judgment." See Prosser, Law of Torts, § 132 (4th ed. 1971).
Davis, 362 So.2d at 643.
In Hudson v. Rausa, 462 So.2d 689 (Miss. 1984), the Court said:
The public officials of this state, elected or appointed, enjoy a qualified immunity to a civil action for damages when acting in the performance of official functions discretionary in nature. They lose that immunity only when they substantially exceed their authority and commit wrongs under color of office. They have no immunity where they commit wilful wrongs or malicious acts. [citations omitted]
Hudson, 462 So.2d at 696.
Again we refer to Grantham-I where this court at page 226 said:
The decisions whether one in custody should be granted parole is attended with broad discretion, Miss. Code Ann. § 47-7-17 (1972), as parole is more a matter of grace than of right. Williams v. State, 445 So.2d 798, 813 (Miss. 1984); Davis v. State, 429 So.2d 262, 263 (Miss. 1983). Indeed, exercise of that discretionary authority is one of the toughest judgment calls any state official may be called upon to make. On the one hand, the offer and somewhat regular grant of parole is an essential ingredient of any rational correctional policy. On the other hand, experience teaches that not even the most careful screening may eliminate all recidivism. In the best run system there will be some parolees who will commit new offenses while on parole.
[6] Our task today is narrow and procedural. Looking to the amended complaint we find that Grantham has charged that the members of the Parole Board paroled Jimpson "with reckless disregard" for her safety. She charges that, prior to their parole decision, these board members did not review "all pertinent information," "the circumstances of Jimpson's offense [murder in the course of robbery]," nor "his previous social history and criminal record."
* * * * * *
... Grantham has charged that Defendants Ruth, Sykes, Kaelin, Figgs and Carter have been guilty of gross neglect of their duties under Section 47-7-17. Though we reject the notion that those duties be classed ministerial, Grantham's amended complaint seems sufficient to pierce the shield of these officials' qualified immunity to suit as outline above. We certainly may not say with confidence that she can, consistent with her allegations, prove no set of facts which would entitle her to relief.
* * * * * *

*211 We intend that not the slightest hint be perceived how this case ought ultimately be decided. Certainly, we in no way intimate that Grantham ought recover, or, for that matter that her claim ought survive summary judgment. Suffice to say that many obstacles loom large before her, not the least of which is causation. See Martinez v. California, 444 U.S. 277, 285, 100 S.Ct. 553, 559, 62 L.Ed.2d 481, 489 (1980).
Grantham, 522 So.2d at 226.
We now look to the facts of this case to determine whether or not the appellants have lost their qualified immunity, either by failure to perform their ministerial functions or by acting with reckless disregard in voting to parole Jimpson to the Friends of Alcoholics (FOA). We look to see whether they considered pertinent information and records and followed the statute covering their functions.
Pertinent information regarding Jimpson was contained in his parole file and the master file. Both those files were secured by the appellants and were before them on December 18, 1984, when the Jimpson case was considered. Figgs testified that he reviewed Jimpson's criminal record, conduct and behavior while in prison, and employment in prison; that he reviewed the psychological evaluation in Jimpson's file.
Appellant Carter testified that he reviewed another file on Jimpson, e.g., the "chairman's file"; that he reviewed the documents therein and that he relied on the 1983 risk evaluation rather than the 1984 evaluation. The 1983 evaluation showed the risk of releasing Jimpson to be low while the 1984 evaluation was high.
The proof on whether or not the appellants complied with the statute, § 47-7-17, (Supp. 1984), or greatly or recklessly exceeded their authority came from them and from documents in Jimpson's file. The following important matters were not contradicted:
(1) All pertinent information concerning Jimpson, as required by § 47-7-17 was secured by the appellants and it was before them at the December 18, 1984, parole meeting.
(2) Figgs reviewed the master file and Carter reviewed the chairman's file.
(3) Figgs' review of Jimpson's file took no less than fifteen (15) minutes.
(4) Figgs summarized his review of Jimpson's file with the appellants who asked questions of Figgs.
(5) Jimpson appeared before the appellants and was interviewed by them.
(6) Ms. Ruth Maxwell, assistant director of the alcohol drug treatment program, appeared before the appellants and related to them Jimpson's progress in the program and how he had gone and spoken to numerous groups about the problem of alcoholism.
(7) Appellants all voted to parole Jimpson to the Friends of Alcoholics (FOA), a drug treatment center at Pocahontas, Mississippi, on the condition that Jimpson abide by the rules and regulations of FOA. He was not paroled to some individual to be turned loose on the streets.
(8) One of the rules of FOA was that Jimpson would be granted no passes for at least two (2) months.
(9) Appellants paroled Jimpson on the condition that arrangements be made with FOA by Ms. Ruth Maxwell.
(10) Arrangements for Jimpson to stay at FOA were made by Ms. Maxwell and that Jimpson went to FOA.
(11) Jimpson was a model client/resident at FOA until he started getting telephone calls from the press.
(12) Immediately after getting the press telephone calls Jimpson violated a condition of his parole and left FOA without being given permission.
In our opinion, the appellants substantially complied with the duties and requirements set forth in the statute for members of the State Parole Board, e.g., particularly Miss. Code Ann. § 47-7-17 (Supp. 1984) and there was no violation of their ministerial duties. Therefore, no liability was imposed on the appellants under this prong of qualified immunity.
We further conclude that, even though the appellants were laymen, untrained, unschooled, and inexperienced in the complex *212 and sensitive problems of probation and parole, and even though judgment and decision was deficient and lacking, they were exercising discretionary authority. Their decision was the result of personal deliberation and judgment. They did not commit wilful wrongs or malicious acts. Hudson, 462 So.2d at 694. Further, they did not act with reckless disregard and did not exceed and pervert their discretionary authority  theirs was an exercise of poor judgment. Grantham-I at page 226.
The real culprit in this case is the State of Mississippi, which failed its citizens miserably in providing an outmoded, archaic parole system, loosely drawn, and with scant guidelines. It placed untrained and unknowledgeable laymen in a sensitive place of importance to perform the work of experts. Yet, when the finger of blame points to the State, absolute governmental immunity insulates and protects it. As a result of the tragic injury sustained by Mrs. Grantham, the State Legislature enacted a law providing for a full time parole board with members who are salaried employees of the State. The law further provided that "the board, its members and staff shall be immune from civil liability for any official acts taken in good faith and in exercise of the board's legitimate governmental authority". § 47-7-5(4) Supp. 1989).
We hold that the lower court erred in declining to sustain the motion for judgment notwithstanding the verdict. Therefore, the judgment of the lower court is reversed and judgment is rendered here for the appellants.
REVERSED AND RENDERED.
All Justices concur as to Part I.
Part II: DAN M. LEE, P.J., and PRATHER, ANDERSON and BLASS, JJ., concur.
Part II: HAWKINS, P.J., and ROBERTSON and SULLIVAN, JJ., dissent with separate opinion.
PITTMAN, J., not participating.
HAWKINS, Presiding Justice, dissenting as to Part II:
I can agree with the majority in its assessment of the dereliction of the State in the system of parole in effect December 18, 1984, the fateful date in which Jimpson's release was authorized. This, however, cannot relieve board members of their personal dereliction.
Courts must bear in mind that having some system of parole of convicts is an absolute necessity, even though we statistically know there will be occasions when a member of the public will be injured as a result of some prisoner's parole. Parole is a necessity because the greatest inducement for good behavior by prisoners is hope of parole. Without hope the cost of keeping prisoners in a penitentiary would be prohibitively expensive. Also, parole based upon good behavior is humane.
It is, therefore, societally necessary that some sort of immunity be given to parole board members; otherwise, good men and women would be unwilling to serve, or members of a parole board would take no risk whatever in their parole decisions.
Absolute immunity, on the other hand, is bad law in the absence of showing some absolute necessity therefor. Absolute immunity removes any inducement, from a personal liability risk, to exercise some degree of reflection and study in releasing a prisoner. This case affords a good example of woeful lack of study and reflection.
Somewhere between these extremes can we fashion a rule which avoids the calloused indifference encouraged by absolute immunity, and at the same time afford enough protection to parole board members that they can feel free to render conscientious, deliberative service? Also, Grantham v. Dept. of Corrections, 522 So.2d 219, 223-224, 226 (Miss. 1988).
We can all recognize by hindsight that releasing Jimpson was a mistake. Yet this alone is insufficient to assess liability. Rather than becoming bogged down in abstractions or legal definitions, let us first examine what these board members failed to do which caused them to authorize Jimpson's release.
*213 Had the board members taken the time to first meaningfully examine Jimpson's file, or to personally interview guards or other personnel at the prison who had personal knowledge of his personality and habits, and then decided to release Jimpson, I could agree that they should be granted immunity while acting in a discretionary capacity. For clearly, the decision to grant or deny parole was discretionary.
Preliminary to this discretionary act, however, was the absolute non-delegable duty of the board members under Miss. Code Ann. § 47-7-17 (1984) to "consider all pertinent information regarding" Jimpson, "including the circumstances of his offense, his previous social history and criminal record, his conduct, employment and attitude while in custody of the department, and the reports of such physical and mental examinations as have been made," i.e., to consider his full record.
It is farcical to pretend they complied with the statute. Not a single member of the board (excluding Ruth) spent any meaningful time studying Jimpson's record. Had any of them done so, it is impossible to believe he/she would have been so devoid of judgment that he/she would vote to release Jimpson. Moreover, no member of the board interviewed any individual who had personal knowledge of Jimpson's behavior.
When these board members voted to release Jimpson, a man repeatedly guilty of dangerous crimes, their knowledge of his habits, behavior and personality in prison was quite near an absolute zero. Yet such information was available to each member. It was this failure to read, to consider Jimpson's record, which triggered the chain of events encompassing the ruination of Grantham's life.
While the board members had the discretionary authority to parole, a condition precedent to its exercise was the absolute duty to comply with this statute. They should not be permitted to contend they had the discretion to fail to comply with Miss. Code Ann. § 47-7-17.
In Grantham, supra, 522 So.2d at 225, we held:
Our law thus directs that a governmental official has no immunity to a civil action for damages if his breach of a legal duty causes injury and (1) that duty is ministerial in nature, or (2) that duty involves the use of discretion and the governmental actor greatly or substantially exceeds his authority and in the course thereof causes harm... .
You may take your pick of dictionaries of the English language. All will state that the word "consider" means to think carefully about a matter prior to making a decision, to contemplate. These board members were charged with the duty to think carefully about Jimpson's record, and of course they could not think carefully about his record unless they had read it, studied it. And, whether one terms their failure to consider Jimpson's record or interview personnel who knew Jimpson a "ministerial" failure, or that the failure to study his record prior to parole was a "great" and "substantial excess of authority" matters little.
A jury issue was clearly made on one or the other. It would make a joke out of the statute to claim it gave the board members the "discretionary" authority to be almost totally ignorant of his record.
Liability should not be imposed because of a mistake. Neither should immunity be granted when the very precaution which bestows immunity has been ignored.
In Grimm v. Arizona Bd. of Pardons and Paroles, 115 Ariz. 260, 564 P.2d 1227, 5 A.L.R.4th 757 (1977), the parole board released an inmate who committed murder, and the heirs sued. In holding the individual members held only a qualified immunity, the Arizona Supreme Court stated:
We have come to this conclusion because of the increasing power of the bureaucracy  the administrators  in our society. The authority wielded by so-called bureaucrats has often been criticized. Comparing the relatively small number of judges with the large numbers of administrators, the idea of fearless, unbridled decision-making becomes less appealing. While society may want *214 and need courageous, independent policy decisions among high level government officials, there seems to be no benefit and, indeed, great potential harm in allowing unbridled discretion without fear of being held to account for their actions for every single public official who exercises discretion. The more power bureaucrats exercise over our lives, the more we need some sort of ultimate responsibility to lie for their most outrageous conduct. There may be even some deterrent value in holding officials responsible for shocking outrageous actions. In any case, democracy by its very definition implies responsibility. [citation omitted] In this day of increasing power wielded by government officials, absolute immunity for nonjudicial, nonlegislative officials is outmoded and even dangerous.
* * * * * *
The Board of Pardons and Paroles in this instance has narrowed its duty from one owed to the general public to one owed to individuals by assuming parole supervision over, or taking charge of, a person having dangerous tendencies. (See, § 319 of the Restatement, Second of Torts discussed infra.) . .. Here the Board members voluntarily assumed responsibility of a highly dangerous person who could be paroled only by Board action. It is black letter tort law that while inaction is not normally a basis for liability, negligent performance of a duty voluntarily undertaken may be a basis for liability.
We may look to the Restatement of Torts, Second for guidance on the issue of the duty owed by the members of the Board of Pardons and Paroles when they decide to release a prisoner. [citation omitted] "Duty of Those in Charge of Person Having Dangerous Propensities" states:
"One who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm."
* * * * * *
The serious potential for harm in such situations mandates liability for injury to individual members of the public despite the fact that the duty could also logically be viewed as one owed to the public in general. The reasoning of § 319 is applicable to the instant circumstances.
We hold that members of the State Board of Pardons and Paroles owe a duty to individual members of the general public when the Board decides to release on parole a prisoner with a history of violent and dangerous conduct toward his or her fellow human beings. The standard of care owed, however, is that of avoiding grossly negligent or reckless release of a highly dangerous prisoner. If the history of an applicant for parole shows a great danger of violence to other humans, the members of the Board are under a duty to inquire further before releasing the prisoner. With medical and psychological evaluations, plus the day-to-day evaluations of the prison personnel, the Board should have access to sufficient information to make an informed decision. If the entire record of the prisoner reveals violent propensities and there is absolutely no reasonable basis for a belief that he has changed, then a decision to release the prisoner would be grossly negligent or reckless.
Implicit in appellant's complaint and brief is the allegation that the Board had before it no evidence to support "[a] reasonable probability that [B]lazak will live and remain at liberty without violating the law." A.R.S. § 31-412. If such is the case and all the information before the Board negates the probability of lawful conduct while on parole, the Board cannot ignore such evidence. We emphasize that no liability is to be imposed when the evidence is conflicting or contradictory, that is, when reasonable minds could differ.
We believe that a limited immunity for members of the Board of Pardons and Paroles with liability only for the grossly *215 negligent or reckless release of a highly dangerous prisoner strikes the proper balance between the competing interests. The public has an interest in protection from premature release of highly dangerous prisoners as well as an interest in holding public officials responsible for outrageous conduct. The Board members have an interest in freedom from suit for reasonable decisions.
[Footnotes omitted; emphasis added]
115 Ariz. at 266-268, 564 P.2d at 1233-1235, 5 A.L.R.4th at 766-768.
Many courts have grappled with this question, endeavoring to fashion an appropriate test to determine when a jury issue is made on liability. Von Hoene v. State Dept. of Rehabilitation, 20 Ohio App.3rd 363, 486 N.E.2d 868 (1985); Doe v. Arguelles, 716 P.2d 279 (Utah 1985); Allentown State Hosp. v. Gill, 88 Pa.Cmwlth. 331, 488 A.2d 1211 (1985); Bellavance v. State, 390 So.2d 422 (Fla. Dist. Ct. App. 1980), cert. denied, 399 So.2d 1145 (Fla. 1981); DuBree v. Commonwealth of Pennsylvania, 481 Pa. 540, 393 A.2d 293 (1978).
In my view Grimm, supra, gives the best, and simplest stated test. Regardless of terminology, in the final analysis no board member should have his liability submitted to a jury on a discretionary decision because of a mistake, or even bad judgment. Such potential liability should go to a jury only if a court has first determined that the official was grossly negligent, or acted through bad faith, corruption or malice. Trial judges are able to make such determination based upon the facts of each case. It goes without saying that scrupulous care should be used by the court in making the determination. This test likewise meets the "substantial excess of authority" criterion we announced in Grantham I.
In holding that the circuit judge erred in submitting this case to the jury, I fear we are only giving lip service to the very standard we recently announced in Grantham I for such cases.
A release of an inmate not in keeping with standards imposed by statute is a non-discretionary act.
I would affirm.
ROBERTSON and SULLIVAN, JJ., join this opinion.
NOTES
[1] A matrix evaluation was explained by Carter as follows:

[T]he evaluation is  there are two evaluations. There's one evaluation that is done, as I understand it, that's determined by a review of the record as to the risk in regards to whether the inmate would be susceptible to committing additional crimes. The other evaluation is how difficult this inmate would be in adjusting to society and how high the risk would be in adjusting to society and how high the risk would be for this person to commit a violation of the parole and have to be returned as a parole violater [sic].
[2] Although the record is not clear as to the definitions or levels of custody or class, it is clear that "A" custody indicates the least restrictive status, while the lower custody classifications indicate more restrictions and less privileges. Class 1 is the least restrictive class.
[3] Figgs admitted that the form was based upon the following errors:

a.) Jimpson received a Risk score of zero on previous probation or parole violations; however, the score would have been two points, which indicated one or more revocations.
b.) Jimpson received a Risk score of zero on rule violation reports (RVR's); however, the score would have been five points, which indicated 11 or more RVR's or any one RVR for escape. Jimpson had several escapes.
c.) Jimpson received a Needs score of zero on "evidence of problems related to substance abuse (alcohol or drugs)"; however, the score would have been either four or seven. A score of four indicated "evidence of a pattern of substance abuse indicates a counseling/monitoring and/or referral need required." A score of seven indicated "evidence of serious substance abuse problems  intensive casework services."
Had the factors been correct, Jimpson would have had a total Risk score on the 1983 Early Release Risk Evaluation of 14, which would have placed him in a Low Medium Risk Level. He would have had a total Needs score of at least five and at most eight, which would have been a Low Needs Level. Nevertheless, Jimpson would have achieved a Matrix Level of Low Medium.
[4] Parker testified that his recommendation on the evaluation was that Jimpson not be paroled. Jefferson gave no recommendation for parole at trial or on the evaluation form, but indicated on the evaluation form that Jimpson's environmental support was questionable.
[5] Parker testified that the scores would have been higher had the factors been correct. He acknowledged the following errors:

a.) Jimpson received a Risk score of zero on probation or parole violations or escapes, an obvious error from his record.
b.) Jimpson received a Risk score of zero on history of drug or alcohol abuse; however, the score would have been either one, two, or three. A score of one indicated a "history of drug or alcohol problems, but no history of narcotics, hallucinogen or glue use." A score of two indicated "history of narcotics use." A score of three indicated "history of problem use of hallucinogens or glue or narcotics."
c.) Jimpson received a Needs score of zero on "evidence of problems related to substance abuse (alcohol or drugs)"; however, the score should have been either four or seven. A score of four indicated "evidence of a pattern of substance abuse indicates a counseling/monitoring and/or referral need required." A score of seven indicated "evidence of serious substance abuse problems  intensive casework services."
If the factors had been correct, Jimpson would have had a total Risk score on the 1984 Early Release Risk Evaluation of at least 21 and at most 23, which would have remained a High risk. He would have had a total Needs score of at least 15 and at most 18, which would have been a High Medium Needs score. Nevertheless, Jimpson would have achieved a Matrix Level of High Risk. These classification errors could be easily seen by comparison of this report with his record.
[6] By Ch. 413, § 103, Law 1989, Miss. Code Ann. § 47-7-5 (Supp. 1989), the parole board members now devote full time to their duties, and are salaried employees of the State. Subparagraph (4) also grants immunity from civil liability to the board and its staff for "official acts taken in good faith and in the exercise of the board's legitimate governmental authority."