Jack L. WESTBROOK, Jr., Individually and as Executor of the Estate of Thelma P. Westbrook, Deceased, and Cambridge Mutual Fire Insurance Company, Plaintiffs,

v.

CITY OF JACKSON, MISSISSIPPI; Russell C. Davis, Dale Danks, Jr., and Kane Ditto, Individually and in their Official Capacities as Mayor or Former Mayors of the City of Jackson, Mississippi; Thomas B. Kelly, Edward L. Cates, Douglas W. Shanks, Nielsen H. Cochran, Fred C. Johnson, Luther L. Roan, Jr., and George Porter, Individually and in their Official Capacities as Former City Commissioners of the City of Jackson, Mississippi; Louis E. Armstrong, Margaret C. Barrett, Derwood R. Boyles, E.C. Foster, Luther L. Roan, Jr., Doris P. Smith, Marcia Weaver, and Kenneth I. Stokes, Individually and in their Official Capacities as Members, or Former Members, of the City Council of the City of Jackson, Mississippi, Defendants.

Civ. A. No. J90–0228(L).

United States District Court,
S.D. Mississippi,
Jackson Division.

Aug. 22, 1991.

---

**2. Sub silentio.** Under silence; without any notice being taken. Black's Law Dictionary 1428 (6th ed. 1991).

---

Roger Googe, Jackson, Miss., for plaintiffs.

Matthew M. Moore, Jackson, Miss., for defendants.

### MEMORANDUM OPINION AND ORDER

TOM S. LEE, District Judge.

On September 17, 1970, the City of Jackson adopted an ordinance pursuant to which an area of Hinds County which included the home of Ms. Thelma P. Westbrook was annexed by the City. A Petition for Ratification, Approval and Confirmation of Ordinance Extending the Boun

aries of the City of Jackson was filed in the Chancery Court for the First Judicial District of Hinds County, and after a hearing by the court, a decree was entered on December 18, 1970 approving the ordinance. The chancery court decree declared "the public and municipal services which the said City of Jackson proposes to render in the newly annexed territory ... and the time within which said services will be rendered ... to be reasonable," and further declared "that the City of Jackson can and will render the proposed public and municipal services as set forth in the original Petition in this cause." That decree was thereafter affirmed by the Mississippi Supreme Court, and the ordinance went into effect on December 28, 1970. As will be discussed in greater detail *infra*, the ordinance provided, *inter alia*, that the City was to furnish water improvements and services and was to provide fire protection to the annexed area.[1]

On February 12, 1989, the Jackson Fire Department responded to a fire at the Westbrook property. The fire department was unable to extinguish the flames and the house and its contents were destroyed by the fire. Plaintiffs, Jack L. Westbrook, Jr., individually and as executor of the estate of Thelma P. Westbrook, and Cambridge Mutual Fire Insurance Company,[2] filed suit in the Circuit Court for the First

Judicial District of Hinds County asserting state and federal law claims seeking recovery for their loss against the City of Jackson and a number of municipal officials, in their official and individual capacities, including present and former mayors, city council members and city commissioners.[3] Defendants removed the action to this court where it is now before the court on the motion of defendants to dismiss plaintiffs' complaint for failure to state a claim upon which relief can be granted. There is also before the court a motion by plaintiffs for summary judgment on the issue of defendants' liability.

Plaintiffs allege in their complaint that the fire department failed to extinguish the fire at the Westbrook home because there was not sufficient water available due to the failure and negligence of the defendants in not having constructed or otherwise having made provision for municipal level water improvements and water service to the property. Plaintiffs further allege that defendants failed to provide adequate fire protection to the property in that defendants knew that special fire fighting equipment was needed at the site but failed to timely dispatch or otherwise provide same. Based on these allegations, plaintiffs charge defendants with negligence and with a breach of duties imposed by state annexation laws, Miss.Code Ann.

---

1. As is pertinent to this litigation, the ordinance made the following provisions:

 SECTION 3. That the City of Jackson shall make the following improvements in the said annexed territory, to-wit:

 . . . . .

 (b) Install water lines, sewer lines and street lighting where necessary and economically feasible.
 Said improvements shall be completed within a reasonable time, not to exceed five (5) years from the effective date of this ordinance, unless delayed by war or military preparedness restrictions.
 SECTION 4. That the said City of Jackson shall furnish to the said annexed territory the following municipal or public services beginning on the effective date of this ordinance, to-wit:

 . . . . .

 (b) Fire protection.

2. Cambridge had written a policy of insurance on the house and, under the terms of the policy, paid the Westbrooks $300,000. Cambridge asserts that it is subrogated to the rights of the Westbrooks to the extent of its payment under the insurance policy.

3. Defendants are City of Jackson; Russell C. Davis, Dale Danks, Jr. and Kane Ditto, individually and in their official capacities as mayor or former mayors of the City of Jackson; Thomas B. Kelly, Edward L. Cates, Douglas W. Shanks, Nielson H. Cochran, Fred C. Johnson, Luther L. Roan, Jr. and George Porter, individually and in their official capacities as former city commissioners of the City of Jackson; and Louis E. Armstrong, Margaret C. Barrett, Derwood R. Boyles, E.C. Foster, Luther L. Roan, Jr., Doris P. Smith, Marcia Weaver and Kenneth I. Stokes, individually and in their official capacities as members or former members of the Jackson City Council.

§§ 21–1–27 to 21–1–41 (1972),[4] along with the annexation ordinance and chancery decree approving same, to provide municipal level water improvements and fire protection. Plaintiffs also assert a claim under 42 U.S.C. § 1983, charging that the defendants' failure to provide adequate water improvements and service and adequate fire protection violated plaintiffs' equal protection and due process rights under the Fourteenth Amendment to the United States Constitution.

The City, and the defendant public officials in their official capacities,[5] contend that they enjoy sovereign immunity against plaintiffs' claims since the provision of water services and fire protection is a governmental function which is discretionary in nature. *See Sykes v. Grantham*, 567 So.2d 200 (Miss.1990); *Poyner v. Gilmore*, 171 Miss. 859, 158 So. 922 (1939). Plaintiffs counter that defendants were required by state and local laws to provide these services and that consequently, this was not a discretionary, but was rather a ministerial function for which defendants are not immune. Defendants in their individual capacities also claim that they have qualified immunity. Because the court concludes that plaintiffs have failed to plead a cognizable constitutional tort, the issue of immunities need not be reached.

Section 1983

 The court begins its analysis of the present motions with the understanding that a loss "does not necessarily presuppose a constitutional violation." *Griffith v. Johnston*, 899 F.2d 1427, 1441 (5th Cir. 1990), *cert. denied,* ─── U.S. ───, 111 S.Ct. 712, 112 L.Ed.2d 701 (1991). The issue presented, therefore, is whether plaintiffs have stated and/or can maintain a federal claim for relief. In any section 1983 action, the first question is whether the section is the appropriate basis for a remedy, which involves consideration of whether the two elements required to support a claim under section 1983 are present: (1) the conduct that harms the victim must be committed under color of state law, and (2) the conduct must deprive the plaintiff of rights, privileges or immunities secured by the Constitution or laws of the United States. *Parratt v. Taylor,* 451 U.S. 527, 535, 101 S.Ct. 1908, 1912, 68 L.Ed.2d 420 (1981). The starting point of the court's consideration of plaintiffs' claim is the isolation of the specific federal right which plaintiffs claim that defendants violated. *Jackson v. Byrne,* 738 F.2d 1443, 1446 (7th Cir.1984). Here, the constitutional rights of which plaintiffs claim to have been deprived are the Fourteenth Amendment rights not to be deprived of property without due process of law and of equal protection.

Due Process

 The Due Process Clause provides "nor shall the state deprive a person of life, liberty or property without due process of law." A section 1983 action can be successfully stated only where the plaintiffs demonstrate that they have asserted a recognized "liberty or property" interest within the purview of the Fourteenth Amendment, and that they were intentionally or recklessly deprived of that interest under color of state law. *Griffith,* 899 F.2d at 1435. It has long been recognized that there generally exists no constitutional right to basic governmental services, such as fire and police protection. *See, e.g., Youngberg v. Romeo,* 457 U.S. 307, 309, 102 S.Ct. 2452, 2454, 73 L.Ed.2d 28 (1982) ("As a general matter, a State is under no constitutional duty to provide substantive services for those within its border"); *Wells v. Walker,* 852 F.2d 368, 370 (8th Cir.1988), *cert. denied,* 489 U.S. 1012, 109 S.Ct. 1121, 103 L.Ed.2d 184 (1989) (as general rule, members of public at large have no constitutional right to be protected by state against harm inflicted by third parties); *Jackson v. Byrne,* 738 F.2d at 1446 (same). This view was confirmed by the

---

**4.** These code sections set forth the procedure to be followed by a municipality when expanding or contracting its boundaries.

**5.** For federal claims, officials in their official capacities can be sued only to the extent that the City itself can be sued, since a suit against them in their official capacities is the equivalent of a suit against the City. *Kentucky v. Graham,* 473 U.S. 159, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985).

United States Supreme Court in *DeShaney v. Winnebago County Department of Social Services,* 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), wherein the Court stated:

> [N]othing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors. The Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security. It forbids the State itself to deprive individuals of life, liberty, or property without "due process of law," but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means.
>
> . . . . .
>
> [O]ur cases have recognized that the Due Process Clauses generally confer no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual. *See, e.g., Harris v. McRae,* 448 U.S. 297, 317–318, 100 S.Ct. 2671, 2688–2689, 65 L.Ed.2d 784 (1980) (no obligation to fund abortions or other medical services) (discussing Due Process Clause of Fifth Amendment); *Lindsey v. Normet,* 405 U.S. 56, 74, 92 S.Ct. 862, 874, 31 L.Ed.2d 36 (1972) (no obligation to provide adequate housing) (discussing Due Process Clause of Fourteenth Amendment); *see also Youngberg v. Romeo,* 457 U.S. [307], 317, 102 S.Ct. [2452], 2458 [73 L.Ed.2d 28] (1982) ("As a general matter, a State is under no constitutional duty to provide substantive services for those within its border"). As we said in *Harris v. McRae,* "[a]lthough the liberty protected by the Due Process Clause affords protection against unwarranted *governmental* interference ..., it does not confer an entitlement to such [governmental aid] as may be necessary to realize all the advantages of that freedom." 448 U.S., at 317–318, 100 S.Ct., at 2688–2689 (emphasis added). If the Due Process Clause does not require the State to provide its citizens with particular protective services, it follows that the State cannot be held liable under the Clause for injuries that could have been averted had it chosen to provide them.

489 U.S. at 195–97, 109 S.Ct. at 1003–1004.[6]

■ Though decided before *DeShaney,* the court in *Jackson v. Byrne* acknowledged these principles. In that case, the parents of two children who died in a fire which occurred during a fire fighters' strike, sued the City of Chicago, its mayor and other public officials, charging that the defendants had deprived plaintiffs and

---

**6.** Prior to *DeShaney,* a number of courts had held that citizens had no right to fundamental governmental services, unless there was some "special relationship" between the government and the victim that distinguished the victim from the general public, as, for example, where there existed a custodial relationship created or assumed by the state, where the state was aware of a specific risk of harm to the victim, or where the state had affirmatively placed the victim in a position of danger. *See DeShaney,* 489 U.S. at 197 n. 4, 109 S.Ct. at 1004 n. 4 (collecting cases). *DeShaney,* however, rejected the "special relationship" notion except as to those cases in which "the State takes a person into its custody and holds him there against his will," in which case "the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *DeShaney,* 489 U.S. at 198, 109 S.Ct. at 1005. The Court explained that in that limited circumstance,

> The affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf.... In the substantive due process analysis, it is the State's affirmative act of restraining the individual's freedom to act on his own behalf ... which is the "deprivation of liberty" triggering the protections of the Due Process Clause, not its failure to act to protect his liberty interest against harms inflicted by other means.

*Id.* Plaintiffs' complaint in the case at bar alleges that City officials were explicitly advised by the Westbrook family of the lack of adequate water improvements and services and fire protection for the property. To the extent that this allegation could be interpreted as alleging a "special relationship" existing by virtue of the City's knowledge of the Westbrooks' predicament, *DeShaney* makes clear that such a claim is not viable as a constitutional matter.

their decedents of rights secured by the Due Process Clause of the Fourteenth Amendment. *Jackson,* 738 F.2d at 1446. The court rejected the argument that the City was liable under section 1983 for failing to adequately protect plaintiffs' decedents from a fire of independent origins, finding that the City had no constitutional duty to act:

> [N]othing in the Constitution requires governmental units to act when members of the general public are imperiled.... In our opinion, "the Constitution is a charger of negative liberties; it tells the [government] to let people alone; it does not require the federal government or the state to provide services, even so elementary a service as maintaining law and order." *Beard v. O'Neal,* 728 F.2d 894, 899 (7th Cir.1984) (quoting *Bowers v. City of DeVito,* 686 F.2d 616, 618 (7th Cir.1982). Thus, when the Chicago fire fighters carried out their strike threat and left the city with a fraction of its former protective work force, they did not omit to perform a duty required of them by the Constitution. The Constitution creates no positive entitlement to fire protection. Similarly, when Mayor Byrne dismissed the striking fire fighters, she did not cause the city to default on an obligation recognized by the Constitution. The fire fighters may have violated state law forbidding work stoppages by essential civil servants and could very well be liable to plaintiffs under principles of state tort law. Nonetheless, the fire fighters, standing under no constitutional duty to act, did not effect a deprivation within the meaning of the Fourteenth Amendment.

*Id.* at 1446. Finally, the court observed: Government officials did not directly kill the Jackson children, and the Constitu-

tion does not guarantee to members of the public at large the adequacy of elementary protective services.

*Id.; see also McClary v. O'Hare,* 786 F.2d 83, 88 (2d Cir.1986) (constitutional violation generally not found where member of public harmed as result of government official's failure to act); *Ramirez v. Sol Goldman,* No. 87 CIV. 4747, 1990 WL 186837 (S.D.N.Y. October 23, 1990) (Due Process Clause does not establish generalized right on part of member of public to adequate local government protection); *Reiff v. City of Philadelphia,* 471 F.Supp. 1262, 1265 (E.D.Pa.1979) (Constitution does not explicitly or implicitly provide right to adequate police protection); *Reedy v. Mullins,* 456 F.Supp. 955, 957 (W.D.Va.1978) (no support for broad claim that municipality is constitutionally required to provide adequate fire protection even though municipality has undertaken such service); *Shortino v. Wheeler,* 531 F.2d 938, 939 (8th Cir.1976) (rejecting argument that municipality which has undertaken to provide fire protection is under constitutional duty to provide adequate service).

The direct cause of the loss of plaintiffs' property loss was the fire; the City did not set the fire or cause the fire to be set. However, there appears to be little dispute that the extent of the loss was exacerbated by the fire department's inability to extinguish the flames as a result of the lack of "an adequate and reliable source of water" with which to fight the fire.[7] Even if a causal link could be established,[8] there would still be no basis for plaintiffs' recovery under section 1983. *DeShaney* teaches that in the Due Process context, it is the government's affirmative acts, rather than

---

7. Chief Chamblee testified by deposition that the fire department could not provide adequate fire protection to the Westbrook property because there was no adequate and reliable source of water. A document entitled "Chief's Run Report," which was prepared by District Chief J.C. Layton regarding the Westbrook fire, under the heading "List unusual condition(s) ...", stated, "No available water."

8. Compare *Martinez v. California,* 444 U.S. 277, 100 S.Ct. 553, 62 L.Ed.2d 481 (1980), in which the Supreme Court determined that state officials could not be held liable under the Due Process Clause for the death of a private citizen at the hands of a parolee since the causal connection between the decision to release the parolee from prison and the murder was too attenuated to establish a deprivation of constitutional rights within the meaning of section 1983. *Id.,* at 284–85, 100 S.Ct. at 558–59.

its failures to act, that are actionable.[9] *See McComb v. Wambaugh,* 934 F.2d 474, 483 (3d Cir.1991) (governmental errors of omission, rather than commission, which made it possible for mother to harm her child, were not actionable under *DeShaney* ); *Griffith,* 899 F.2d at 1438 (claim that Texas Department of Human Services failed to provide sufficient information to prospective adoptive parents "starkly raises the distinction between governmental interference and governmental assistance as a basis for Due Process relief.... *DeShaney* demonstrates that the Due Process Clause does not demand positive assistance to secure constitutional rights"); *Luster v. Price,* No. 90–0115–CV–W–8 (W.D.Mo. 1990) (*DeShaney* foreclosed due process claim that police failed to protect from attack since there was no allegation that defendants affirmatively caused attack); *Baugh v. City of Milwaukee,* No. 88–C–1230, 1989 WL 69879 (E.D.Wis. March 8, 1989) (where plaintiffs were not arguing that government officials started house fire which caused deaths at issue, they had not and probably could not state federal claim for violation of due process rights). Plaintiffs' claim suffers from this infirmity; there was no affirmative act by the City that is said to have caused their loss. Rather, plaintiffs complain of the City's failure to act and claim that their loss could have been prevented had defendants performed their duties. *DeShaney* simply forecloses any possibility of a successful claim predicated on a due process violation.

Even assuming solely for the sake of argument that this alleged failure to provide adequate government services could be actionable despite *DeShaney* 's explicit holding on that issue, plaintiffs' claim would still fail. There is in this case the absence of any suggestion that the City's failure to provide municipal level water service and improvements and fire protection to the Westbrook property placed the Westbrooks in any worse position than they were in before the annexation. In *DeShaney,* the Court observed that the State had played no part in creating the dangers faced by the minor victim, Joshua, and did nothing to render him any more vulnerable to those dangers; Joshua, the Court said, was in no worse position by virtue of any actions taken by the State than he would have been had the State not acted at all. *DeShaney,* 489 U.S. at 201, 109 S.Ct. at 1006. *See also Freeman v. Ferguson,* 911 F.2d 52, 55 (8th Cir.1990) (before it assumes corresponding duty to protect, government must increase danger of private violence; *DeShaney* establishes that overall danger must at least be greater than it would be absent state action); *cf. Ross v. United States,* 910 F.2d 1422 (7th Cir.1990) (state can be liable when it actively cuts off private sources of help).

Plaintiffs could state a claim under the Due Process Clause if their complaint raised a cognizable property interest of which the City deprived them. Though holding explicitly that a right to protective governmental services is not of constitutional origin, the *DeShaney* Court left open the question of whether state law may nevertheless create an entitlement to such services which would enjoy due process protection under *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972).[10] It is upon such a theory that plaintiffs in the case *sub judice* apparently predicate their due process claim. In *Roth,* the Court held that property interests created by state law were protected by the

---

**9.** This, of course, is except for those specific and narrow instances described by the *DeShaney* court as where the State has custody or control of the person, or where the state creates the danger. The Supreme Court in *DeShaney* limited the circumstances giving rise to a special relationship to the following situation: "when the State takes a person into custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general wellbeing." 489 U.S. at 199–200, 109 S.Ct. at

1005–1006; *Nelson v. Missouri Osteopathic Foundation,* 626 F.Supp. 604, 607 (W.D.Mo. 1985) (government generally has no duty to protect public from dangerous madmen but duty to protect does arise when government knowingly or recklessly puts a specific individual into position of danger).

**10.** The Court declined to address that argument since it was advanced for the first time on appeal.

Due Process Clause. Such interests, the Court said,

> are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.

408 U.S. at 577, 92 S.Ct. at 2709. Therefore,

> [t]o have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it.

*Id. See also Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 432, 102 S.Ct. 1148, 1155, 71 L.Ed.2d 265 (1982) (hallmark of property is individual entitlement grounded in state law which cannot be removed except for cause).

In a case similar to this one, the plaintiffs urged that town officials took their right to fire protection under the color of authority without due process of law. The court in *Reedy v. Mullins*, 456 F.Supp. 955, 957 (W.D.Va.1978), stated:

> The Fourteenth Amendment places procedural constraints on governmental actions that work a deprivation of "property" interests encompassed by the meaning of the Due Process Clause. However, plaintiffs have failed to show that expectations of adequate municipal fire protection rise to the stature of "property." These substantive property interests are not created by the Federal Constitution but by an independent source, such as state law. Once the substantive interest is found, federal law determines whether the interest has constitutional protection.

*Reedy*, 456 F.Supp. at 957. The court rejected the argument that a protected "property" right arose by virtue of a vague "social contract" between a city and its residents by which citizens pay taxes to support their government and the government in turn furnishes protection and conveniences for the taxpayers.

Plaintiffs in the case at bar suggest that they have a property interest in fire protection, though the source of this alleged property right is somewhat more concrete than a "social contract;" in particular, plaintiffs claim that they have a property interest by virtue of the annexation ordinance which states that the City "shall provide to the ... annexed area ... [f]ire protection." [11] The question thus presented is whether the ordinance upon which plaintiffs rely as their source of entitlement to adequate fire protection grants them a property right in the provision of that service. In this regard, the court in *Wooters v. Jornlin*, 477 F.Supp. 1140 (D.Del.1979), *aff'd*, 622 F.2d 580 (3d Cir.), *cert. denied*, 449 U.S. 992, 101 S.Ct. 528, 66 L.Ed.2d 289 (1980), presented with the "unusual claim that certain state and county laws [had] created a property interest in the provision of a government service," found it "necessary to flesh out the notion of 'entitlement' as that term would apply to the provision of a general government service," stating as follows:

> It is often said that for any right to exist, there must be some corresponding duty. Hence, if one wishes to claim a right to a general governmental service, he must show that the provider of the service has a duty to provide that service. If the furnishing of the service is left to the discretion of the provider then there can be no entitlement. The party claiming the right must further show that the duty is owed to him as an individual rather than to the public at large. Of course, there could be some service which is owed to each and every individual in a political unit and hence could be considered a property interest. Nevertheless, in order to become property the service must be owed to discrete individuals or individual entities.... [I]t has been held that laws providing the

---

**11.** The court notes that plaintiffs' complaint does contain the affirmative allegation that plaintiffs have at all times paid their taxes to the City of Jackson which is vaguely suggestive of the same type argument advanced in *Reedy*.

*general public* with police or fire protection do not grant *individuals* a property right in that protection. *Shortino v. Wheeler*, 531 F.2d 938, 939 (C.A.8, 1976); *Reedy v. Mullins*, 456 F.Supp. 955, 958 (W.D.Va.1978); *Reiff v. City of Philadelphia*, 471 F.Supp. 1262 (E.D.Pa.1979). All of these cases involved claims of entitlement to the provision of governmental services. Moreover, in all cases the defendants had a duty to provide the services.... The duty [though,] was owed to the undifferentiated *general public.* Thus, ... in order to establish the existence of a property interest in [a general governmental service,] the plaintiffs must point to (1) an independent source of authority (2) that establishes an absolute duty (3) that is owed to them as individuals rather than as members of the undifferentiated public.

*Wooters*, 477 F.Supp. at 1144.

The ordinance at issue in the case at bar states that the City *"shall* furnish ... [f]ire protection," and might therefore be read to create a mandatory duty on the part of the City. (emphasis added).[12] However, the fire protection afforded plaintiffs was allegedly inadequate for the reason that the City had failed to run water lines to the property, resulting in an unavailability of water with which to fight the fire. Regarding the provision of water services, the annexation ordinance states that "the City ... shall ... [i]nstall water lines ... where necessary and economically feasible," thus making the decision whether to lay water lines dependent on the judgment and discretion of city officials and giving the impression of a distinctly discretionary function. In the court's view, the ordinance can only be reasonably interpreted by reading these two provisions together. So construing the ordinance, it would appear that the decision whether to furnish water lines was discretionary unless the water line was essential to the provision of adequate fire protection; if needed for adequate fire protection, then the City was required by the ordinance to provide the

lines. Even assuming, however, that the ordinance placed an affirmative obligation on the City to provide these governmental services, *cf. Hynson v. City of Chester*, 731 F.Supp. 1236, 1240 (E.D.Pa.1990) (state's Protection From Abuse Act did not create property interest where act did not mandate particular police protection but merely granted authority to act), plaintiffs are nevertheless precluded from maintaining a federal cause of action since the ordinance does not grant them a constitutionally cognizable property interest. That is because the ordinance does not grant to plaintiffs *as individuals,* a specific right to these services. Rather, the ordinance recites that these services will be furnished to all persons residing within the annexed area.

It has been consistently held, as was recognized by the court in *Wooters,* that a duty to provide general governmental services, such as police and fire protection, is owed to the public in general rather than to particular individuals. *Wooters,* 477 F.Supp. at 1146 (duty to provide police or fire protection is owed to public in general and not to any given individual); *see also Balistreri v. Pacifica Police Dept.,* 901 F.2d 696, 699 (9th Cir.1990) (no constitutional duty of state officials to protect members of the public at large from crime in absence of "special relationship" between state officials and particular member of the public); *Beard v. O'Neal,* 728 F.2d 894, 900 (7th Cir.), *cert. denied,* 469 U.S. 825, 105 S.Ct. 104, 83 L.Ed.2d 48 (1984) (no constitutional duty to provide protection to member of general public who has no special custodial or other relationship with government); *Jackson v. Byrne,* 738 F.2d at 1147 (Constitution does not guarantee to members of public at large the adequacy of elementary protective services); *Siddle v. City of Cambridge, Ohio,* 761 F.Supp. 503, 509 (S.D.Ohio 1991) (primary duty of government is to protect the public; absent some exception, plaintiff not entitled to protection as individual); *Coffman v. Wilson Police Dept.,* 739 F.Supp. 257, 265

---

**12.** *But cf. Wooters,* 477 F.Supp. at 1146 (word "shall" may be given merely directory meaning if the law's purpose is protection or organiza-

tion of government by guidance of officials rather than granting of rights to private person).

(E.D.Pa.1990) (generally, one injured by another who violates law may not sue police department for breach of duty to protect since duty of police to protect is owed by municipality to citizenry as whole rather than to any individual). Indeed, that is the principle upon which the *DeShaney* ruling is based.

In the court's view, it is apparent that the intent of the annexation ordinance was that persons in the annexed area be placed on equal footing with residents of all other areas of the City vis-a-vis the provision of municipal services. To hold that the ordinance granted specific rights to persons in the annexed area would present rather an anomaly: Only residents of annexed areas would possess a property interest in receiving the described protective governmental services, entitling them to due process protection; no such right would be afforded the residents of any other areas of the city. The court can perceive no reasoned basis for such a distinction. It was intended by the ordinance only that persons in the annexed territory would receive municipal services on the same basis as other city residents. It certainly was not the intent of the ordinance that the annexed residents be placed in a more favorable position than other residents. Therefore, plaintiffs cannot be said to have a property interest in the provision of these services.

In summary, though plaintiffs maintain that theirs is a viable federal claim, their putative section 1983 claim is, in the court's opinion, nothing more than a state law claim for breach by defendants of their state law duties. *See Archie v. City of Racine,* 847 F.2d 1211, 1216 (7th Cir.1988), *cert. denied,* 489 U.S. 1065, 109 S.Ct. 1338, 103 L.Ed.2d 809 (1989) (illegality of official action under state statute can neither add to nor subtract from its constitutional validity).

Equal Protection

■ The Fourteenth Amendment's Equal Protection Clause provides that no State "shall deny to any person within its jurisdiction the equal protection of the laws." The Court's opinion in *DeShaney* did not foreclose claims for failure to pro-

vide governmental services predicated on the Equal Protection Clause rather than the Due Process Clause. The Court observed that "[t]he State may not, of course, selectively deny its protective services to certain disfavored minorities without violating the Equal Protection Clause." *DeShaney,* 489 U.S. at 197 n. 3, 109 S.Ct. at 1004 n. 3. *See also McKee v. City of Rockwall,* 877 F.2d 409, 418 (5th Cir.1989), *cert. denied,* 493 U.S. 1023, 110 S.Ct. 727, 107 L.Ed.2d 746 (1990) (plaintiff victim of assault could sustain equal protection claim for inadequacy of police protection only upon proof that non-arrest of perpetrator was result of discrimination against protected class); *Watson v. City of Kansas City, Kansas,* 857 F.2d 690, 694 (10th Cir. 1988) ("Although there is no general constitutional right to police protection, the state may not discriminate in providing such protection."); *Campbell v. Bowlin,* 724 F.2d 484 (5th Cir.1984) (plaintiff should have been permitted to have jury consider section 1983 claim where he presented proof that showed he was denied municipal services on account of his race); *Bowers v. DeVito,* 686 F.2d 616, 618 (7th Cir.1982) (discrimination in providing protection against private violence could violate Equal Protection Clause); *Baugh v. City of Milwaukee,* No. 88–C–1230, 1989 WL 69879 (E.D.Wis. March 8, 1989) (once governmental body undertakes to provide services, it must do so without regard to race).

Plaintiffs' equal protection claim is set forth in their complaint, as follows: "[T]he Defendants provided improvements and services to other individuals and property owners in the area that was annexed pursuant to said ordinance, without providing said improvements and services to Plaintiffs and Plaintiffs' property." In other words, plaintiffs claim that despite a law which required that a certain level of services be provided to all residents of a defined area of the city, such services were provided to some, but not all residents of that area. Thus, plaintiffs are apparently challenging as discriminatory and arbitrary the administration of the duties alleged to be imposed by the ordinance. *See McKee,* 877 F.2d at 421 (Goldberg, J., dissenting)

(plaintiff may challenge administration of a neutral law on equal protection grounds; discriminatory treatment subject to equal protection analysis). Plaintiffs' claim in ·this regard must fail. Absent any allegation of an *improper classification* or discrimination among citizens, there is no judicially cognizable equal protection cause of action. *Shortino,* 531 F.2d at 939 (allegation of inadequacies in fire protection throughout city insufficient; no allegation of discrimination against any group or geographical area); *Reiff,* 471 F.Supp. at 1266 (equal protection claim dismissed where plaintiff did not allege failure to provide police protection to plaintiff because of her race, color or creed). According to plaintiffs' theory in the case at bar, the alleged violation here defines the classification: the class to which plaintiffs claim to belong is those persons in the annexed area who were not provided the governmental services at issue and the violation is the failure to provide those governmental services. The only characteristic common to those residents who were denied the services in question is the fact of their being denied such services; the putative class members are similarly situated only because they did not receive these services. *Griffith,* 899 F.2d at 1441 (Equal Protection Clause mandates all similarly situated persons be treated alike). Under the scenario presented by plaintiffs, there has been no classification of persons who are claimed to have been discriminated against.

In any event, judgment for defendants is in order as to this claim. In *Philadelphia Police and Fire Association for Handicapped Children, Inc. v. City of Philadelphia,* 874 F.2d 156 (3d Cir.1989), the plaintiffs alleged that violations of their Fourteenth Amendment equal protection and substantive due process rights resulted from a budgetary shortage which had induced a reduction by the state and city of mental retardation services provided to mentally retarded persons living at home. The court explained that equal protection jurisprudence recognizes that "the act of governing often requires a state to bestow a benefit on some, but not all, of its citizens." *Philadelphia Police and Fire Ass'n,* 874 F.2d at 162. However, where a legislative-made classification does not affect a fundamental right or suspect group, there exists a presumption in favor of that classification. *Vance v. Bradley,* 440 U.S. 93, 96–97, 99 S.Ct. 939, 942–43, 59 L.Ed.2d 171 (1979) (*cited in Philadelphia Police and Fire Ass'n,* 874 F.2d at 162). Since plaintiffs' claim does not involve a fundamental right or a suspect or quasi-suspect classification, the decisions made by defendants need only be rationally related to a legitimate government purpose. *Philadelphia Police and Fire Ass'n* 874 F.2d at 163 (citing *Kadrmas v. Dickinson Public Schools,* 487 U.S. 450, 108 S.Ct. 2481, 1489, 101 L.Ed.2d 399 (1988)); *see also Perkins v. City of Philadelphia,* 766 F.Supp. 313 (E.D.Pa.1991) (under lenient standard of rational relationship, plaintiff could not prove any set of facts in support of claim that police policy of affording missing reports of minors more time and resources than those concerning adults was irrational or linked to illegitimate objective). Thus, if there was a legitimate purpose for the City's decisions, and defendants could reasonably have believed that their decisions to supply the described services to some but not all residents of the annexed area were justified, the City cannot have committed a constitutional violation. In this regard, the "heavy burden" is on plaintiffs to demonstrate that defendants' action—or inaction—was arbitrary and irrational in relation to a legitimate governmental objective. *Philadelphia Police and Fire Ass'n,* 874 F.2d at 163 (citing *Hodel v. Indiana,* 452 U.S. 314, 331–32, 101 S.Ct. 2376, 2386–87, 69 L.Ed.2d 40 (1981)). There is no evidence in the record to demonstrate that city officials acted discriminatorily, arbitrarily or irrationally in failing to provide water services and fire protection to plaintiffs, or that the defendants acted in pursuit of an illegitimate purpose. Rather, the proof suggests that economic realities and practicalities were the touchstone for the administrative decisions concerning the provision of services. That is, the decisions were made in light of budgetary constraints faced by the City. Russell C. Davis, former mayor, testified that after

the property was annexed, the City probably had money available that could have been used to lay a water line to the Westbrook property—$50,000 to $60,000. However, Davis further explained:

> But, of course, you must—you must accept the fact that there were many demands on the same funds. You could have taken the $50,000.00 that you could have used to lay water to 25 houses and used it to lay water to one house.

He indicated that the wisdom of doing that was questionable, and stated that while the City probably could have "found the money" from somewhere, i.e., cutting funds for other programs, the determination as to what city money will be spent on is a question of priorities. Davis went on to say that

> The city is always under a constraint for funds. Even though they have money, they don't have money to do everything that they need to do or that they ought to do.

Further, Davis expressed that the City was "doing all that could be done with the resources that we had to comply with the ordinance;" "with the resources we had, we did as much as we could do." For these reasons, Davis agreed that the City should "be very careful when they start annexing property."

In *Dandridge v. Williams*, 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970), the Supreme Court, quoting *Metropolis Theatre Co. v. City of Chicago*, 228 U.S. 61, 69–70, 33 S.Ct. 441, 443, 57 L.Ed. 730 (1913), observed that " '[t]he problems of government are practical ones and may justify, if they do not require, rough accommodations—illogical, it may be, and unscientific.' " Perhaps it is the case that the annexation should not have been proposed, adopted or approved given the City's practical financial inability to provide these governmental services. Plaintiffs, though, are not complaining about the annexation *per se*, and indeed, had there been no annexation, there could obviously have been no argument whatsoever that the City owed any duty to plaintiffs. But the annexation's having been approved, the City was *constitutionally* required only to make choices regarding what services would be provided to whom, and when, on a basis that was not discriminatory, arbitrary or irrational and which was not intended to serve any illegitimate purpose. There is no proof to indicate that the City did not comply with this standard.

Of course, nothing herein should be interpreted to suggest that plaintiffs do not have a cause of action under state law, for that is an issue not reached by the court. The court simply holds that defendants' omission to provide the services at issue is not an omission of constitutional dimension; defendants, being under no constitutional duty to provide such services, cannot incur liability under section 1983 for any loss which may have been occasioned by that omission.

Having concluded that plaintiffs' federal claims which supported the removal of this action should be dismissed, the court declines to exercise pendent jurisdiciton over plaintiffs' state law claims. *Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 348, 108 S.Ct. 614, 617, 98 L.Ed.2d 720 (1988) (federal district court could remand properly removed case to state court when only state law claims remained to be litigated); *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966) (if federal claims dismissed before trial, state claims should be dismissed as well); *see also* 28 U.S.C. § 1367 (West.Supp.1991) (district court may decline to exerise supplemental jurisdiction over claim if district court has dismissed all claims over which it had original jurisdiction). Plaintiffs initiated this action in state court and the case will therefore be remanded to that court.

Based on the foregoing, it is ordered that plaintiffs' section 1983 claim is dismissed. It is further ordered that this cause is remanded to the Circuit Court of the First Judicial District of Hinds County.

ORDERED.