**Elizabeth Z. NEWSOM, Individually and as Natural Mother and Next Friend to Larry Newsom, Jr., a Minor, Plaintiff,**

v.

**Austin STANCIEL, as Chief of Police for The City of Greenwood, and The City of Greenwood, Mississippi, Defendants.**

**Civ. No. GC91–126–S–O.**

United States District Court, N.D. Mississippi, Greenville Division.

May 2, 1994.

---

Trent L. Howell, Water Valley, MS, S. Allan Alexander, Tollison, Austin & Twiford, Oxford, MS, for plaintiff.

Steven J. Allen, W. Thomas Siler, Jr., Phelps Dunbar, Jackson, MS, for defendants.

## *MEMORANDUM OPINION GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT*

SENTER, Chief Judge.

This cause is before the court on the motion of the defendants for summary judg-

ment. The court previously entered an order which granted a motion to dismiss as to Austin Stanciel in his individual capacity and denied the motion with regard to the City of Greenwood and Austin Stanciel in his official capacity.

## Facts

On May 4, 1991, the plaintiff and her husband, Larry Newsom, were visiting the plaintiff's brother, Danilo Zamora, in Greenwood, Mississippi. By early afternoon, Danilo and Larry had begun drinking alcohol. After dinner Larry Newsom stopped, but Danilo continued. Later in the evening, Danilo and his wife, Nidia, along with the plaintiff and Larry, went to the lounge at the Scottish Inn on Highway 82 in Greenwood. Danilo continued to drink. He become involved in a fight with another patron, and a proprietor of the lounge, Luther French, called the police. Greenwood police officers Steve Bland, Todd Moore, Leon Edwards, Reginald Dean, and auxiliary officer Eugene Walker all responded to the scene. Danilo was handcuffed, removed from the lounge, put into the police vehicle driven by Officer Dean and Officer Walker, and transported to the Greenwood Police Department. Danilo was visibly mad, resisted the police officers, and vowed vengeance against Luther French.

Michelle French, the daughter of an owner of the lounge, told Officer Edwards that Danilo might have a weapon. Edwards radioed this information to police department personnel. The Frenches decided not to press charges against Danilo, after Officer Bland told them that Danilo would nevertheless be held for about six hours. Nidia called the police department and was told that her husband Danilo would be held until morning. At the police department, Officer Dean removed Danilo's handcuffs and told him to wash his face at the water faucet. After talking with Danilo, Officer Bland left Danilo in the carport of the police department and went inside. When Officer Edwards walked back outside, both Officer Bland and Danilo were gone.

Danilo returned to his home shortly thereafter, proceeded to a bedside table, and retrieved his gun. He told his sister, the plain-

tiff, and Larry Newsom to leave his house. He was very angry and appeared to be still intoxicated. Somehow during the confusion, Danilo Zamora shot and killed his brother-in-law, Larry Newsom, the plaintiff's husband.

## Summary Judgment Standard

On a motion for summary judgment, the court must ascertain whether there is a genuine issue of material fact. Fed.R.Civ.P. 56(c). This requires the court to evaluate "whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). The United States Supreme Court has stated that "this standard mirrors the standard for directed verdict ... which is the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict. If reasonable minds could differ as to the import of the evidence, however, a verdict should not be directed." *Anderson,* 477 U.S. at 250–51, 106 S.Ct. at 2511 (citation omitted). Further, the Court has noted that the "genuine issue" summary judgment standard is very similar to the "reasonable jury" directed verdict standard, the primary difference between the two being "procedural, not substantive." *Id.* at 251, 106 S.Ct. at 2512. "In essence ... the inquiry under each is the same: whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52, 106 S.Ct. at 2512. Further, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252, 106 S.Ct. at 2512 (citation omitted). However, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict. The evidence of the nonmovant is to be be-

lieved, and all justifiable inferences are to be drawn in his favor." *Id.* at 255, 106 S.Ct. at 2513. Once a properly supported motion for summary judgment has been filed, it is incumbent upon the nonmovant to go beyond the pleadings and arguments of counsel in order to establish that there is a genuine issue of material fact for trial. *See generally, Professional Managers, Inc. v. Fawer, Brian, Hardy & Zatzkis,* 799 F.2d 218, 221–23 (5th Cir.1986).

## Discussion

The plaintiff seeks relief through three separate theories.[1] The first alleges a violation of the plaintiff's substantive due process rights guaranteed by the Fourteenth Amendment and brought pursuant to 42 U.S.C. § 1983. The second alleges the City of Greenwood failed to adequately train and/or supervise its police officers which resulted in a violation of the plaintiff's substantive due process rights. Finally, the plaintiff seeks recovery under Mississippi's wrongful death statute. The defendants assert that they did not violate the plaintiff's due process rights since they did not have a duty to protect the plaintiff from random acts of violence. They argue that the plaintiff has presented no evidence of deliberate indifference in training their law enforcement officers. And finally, defendants state they are protected against any state law claims by the doctrine of sovereign immunity.

## I. Due Process Clause

■ The plaintiff claims a violation under the Due Process Clause of the United States Constitution which provides: "nor shall any state deprive any person of life, liberty or property without due process of law." A section 1983 action can be successfully stated only where the plaintiff demonstrates that she has asserted a recognized "liberty or property" interest within the purview of the Fourteenth Amendment, and that she was intentionally or recklessly deprived of that interest under color of state law. *See Westbrook v. City of Jackson, Mississippi,* 772

F.Supp. 932, 935 (S.D.Miss.1991) (*citing, Griffith v. Johnston,* 899 F.2d 1427 (5th Cir. 1990)). "[T]he fourteenth amendment was 'intended to secure the individual from the arbitrary exercise of the powers of government' which resulted in 'grievous losses' for the individual." *Griffith v. Johnston,* 899 F.2d at 1435 (quoting *Kentucky Dept. of Corrections v. Thompson,* 490 U.S. 454, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989)). "Its purpose was to protect the people from the State, not to ensure that the State protected them from each other." *DeShaney v. Winnebago Soc. Serv.,* 489 U.S. 189, 196, 109 S.Ct. 998, 1003, 103 L.Ed.2d 249 (1989).

■ There generally does not exist a constitutional right to basic governmental services, such as fire and police protection. *See Youngberg v. Romeo,* 457 U.S. 307, 309, 102 S.Ct. 2452, 2453–54, 73 L.Ed.2d 28 (1982).

> [N]othing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors. The Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security. It forbids the State itself to deprive individuals of life, liberty, or property without "due process of law," but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means.

. . . .

> If the Due Process Clause does not require the State to provide its citizens with particular protective services, it follows that the State cannot be held liable under the Clause for injuries that could have been averted had it chosen to provide them.

*DeShaney,* 489 U.S. at 195–97, 109 S.Ct. at 1003–04. In *DeShaney* the plaintiff, Joshua DeShaney, was a young boy rendered permanently brain damaged by repeated beatings from his father. Joshua was placed in temporary custody of a hospital upon the recom-

---

1. The court will refer to Elizabeth Z. Newsom in her derivative, representative and individual ca-

pacity as "plaintiff."

mendation of the Winnebago County Department of Social Services after he was hospitalized because of multiple bruises and abrasions. The Department of Social Services (DDS) suspected Joshua was being abused by his father. The case was eventually dismissed and Joshua was returned to his father. During the next year and one half, Joshua was hospitalized twice for injuries and a DDS caseworker documented suspicions of continuing child abuse. The plaintiffs alleged that the defendants' failure to remove him from his father's custody deprived Joshua of his liberty in violation of the Due Process Clause of the Fourteenth Amendment. The United States Supreme Court held that Joshua had not suffered a constitutional tort, since the DDS did not have a duty to protect him from random acts of violence.

"Section 1983 imposes liability for violations of rights protected by the Constitution, not for violations of duties of care arising out of tort law." *Baker v. McCollan,* 443 U.S. 137, 146, 99 S.Ct. 2689, 2695–96, 61 L.Ed.2d 433 (1979). *"DeShaney* makes it plain that the state's failure to protect a person can amount to a deprivation only if the state had a duty to act." *Salas v. Carpenter,* 980 F.2d 299, 308 (5th Cir.1992). *"DeShaney,* teaches that in the Due Process context, it is the government's affirmative acts, rather than its failures to act, that are actionable." *Westbrook,* 772 F.Supp. at 938. "The due process clause is not implicated by a negligent act of an official which causes unintended loss of or injury to life, liberty, or property." *Salas v. Carpenter,* 980 F.2d at 306.

"A substantive due process right to protective services exists when the state holds persons in custody or similarly limits their ability to care for themselves." *Salas,* 980 F.2d at 308 *(citing Doe v. Taylor Ind. School Dist.,* 975 F.2d 137, 146 (5th Cir.1992)); *see also Westbrook,* 772 F.Supp. at 938 n. 9 (special relationships only "where the State has custody or control of the person, or where the state creates the danger."). "Where the government's control is lessened, so is its duty, and its failings are less likely to be of constitutional proportions cognizable under section 1983." *McClary v. O'Hare,* 786 F.2d 83, 88–89 (2d Cir.1986). The devel-

opment of exceptions to the general proposition that government is under no duty to provide protection to any specific member of society, better known as special relationships, "lies in constraints the state imposes on private action." *Walker v. Rowe,* 791 F.2d 507, 511 (7th Cir.1986). The *DeShaney* court stated:

> The affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf ... in the substantive due process analysis, it is the State's affirmative act of restraining the individual's freedom to act on his own behalf ... which is the "deprivation of liberty" triggering the protection of the Due Process Clause, not its failure to act to protect his liberty interest against harms inflicted by other means.

*Id.* 489 U.S. at 200, 109 S.Ct. at 1005–1006.

"Courts have found a denial of due process when the state creates the faced dangers." *Salas,* at 309 *(citing Gregory v. City of Rogers,* 974 F.2d 1006, 1010 (8th Cir.1992); *L.W. v. Grubbs,* 974 F.2d 119, 121 (9th Cir.1992); *Wood v. Ostrander,* 879 F.2d 583 (9th Cir. 1989); *White v. Rochford,* 592 F.2d 381 (7th Cir.1979). *Salas v. Carpenter* arose out of a hostage situation. Sheriff Carpenter commanded the policemen's efforts to free the hostage. The evidence showed that Sheriff Carpenter had ordered the Fort Worth SWAT team and hostage negotiation team off the premises, even though they had more training and experience. The *Salas* court quoted the following passage from an Eighth Circuit decision:

> a constitutional duty to protect an individual against private violence may exist in a non-custodial setting if the state has taken affirmative action which increases the individual's danger of, or vulnerability to, such violence beyond the level it would have been at absent state action.

*Freeman v. Ferguson,* 911 F.2d 52 (8th Cir. 1990). The *Salas* court found that the defendants had not created the dangerous situation nor had they increased the risk to the

plaintiff, and therefore the Sheriff's department had no duty to act, and no constitutional violation occurred when it failed to act. The much quoted Seventh Circuit opinion of *Bowers v. DeVito*, 686 F.2d 616, 618 (7th Cir.1982), states it succinctly:

If the state puts a man in a position of danger from private persons and then fails to protect him, it will not be heard to say that its role was merely passive; it is as much an active tortfeasor as if it had thrown him into a snake pit.

■ First, this court does not believe the plaintiff has submitted evidence which raises a genuine issue of fact that Danilo had violent tendencies, or that the police knew or should have known that Danilo had violent tendencies. Second, the court has been presented no evidence that the defendants had reasons to know that the decedent was in any particular danger from Danilo. And third, the plaintiff has not presented any evidence that the defendants either created or increased the decedent's chances of encountering this random act of violence.

The plaintiff argues that the police knew that Danilo was intoxicated and angry, possibly possessed a firearm, and had a history of violent behavior, and they should have known that Larry Newsom, as a house guest, faced a special danger from Danilo if he were not held for six hours. The court simply cannot agree. Taken as true all of the propositions argued by the plaintiff which the police could have observed or were in prior knowledge of, how would the police have known that Larry Newsom somehow was in particular danger? There is no evidence that the Greenwood police knew Larry Newsom was staying at Danilo's home. Even if they had known, there is no evidence, beyond mere allegations, which would not have been available to the police on the night of May 4, 1991, that Danilo was predisposed to commit an act of such a violent nature. The plaintiff argues vehemently that Danilo's intoxicated condition mandated his incarceration. Yet the police officers testified during their depositions that arresting an individual for public drunkenness was a decision left to each officer. Officer Bland stated that he knew Danilo had been drinking, but that he did not

appear any more intoxicated than the other patrons of the Scottish Inn Lounge. The plaintiff's contrary evidence does not make Danilo's state of intoxication a material issue. What are material issues, and undisputed, are that Larry Newsom was never in the custody of the defendants and that Danilo Zamora was not an employee of the defendants.

The Supreme Court in *DeShaney* stated:

While the State may have been aware of the dangers that Joshua faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them. That the State once took temporary custody of Joshua does no alter the analysis, for when it returned him to his father's custody, it placed him in no worse position than that which he would have been in had it not acted at all.

*Id.* 489 U.S. at 201, 109 S.Ct. at 1006; *also see Chrissy F. v. Mississippi Dept. of Public Welfare*, 780 F.Supp. 1104 (S.D.Miss.1991), aff'd 925 F.2d 844 (5th Cir.1991) (remanded on other grounds). The defendants never assumed a custodial relationship over Larry Newsom nor did they create the danger encountered by the decedent or affirmatively place him into an arena of known danger. Larry Newsom was not put in any worse position by the acts of the Greenwood police officers. Accordingly, the plaintiff did not suffer a violation of the Due Process Clause, and summary judgment is appropriate on this claim.

The plaintiff argues that the court should adopt the rulings announced in *Cornelius v. Town of Highland Lake*, 880 F.2d 348 (11th Cir.1989), *Estate of Sinthasomphone v. City of Milwaukee*, 785 F.Supp. 1343 (E.D.Wis. 1992), and *Wood v. Ostrander*, 879 F.2d 583 (9th Cir.1989). These cases are distinguishable. In *Cornelius* the plaintiff worked in the town hall. The city had inmate work squads perform assorted manual labor around the town. The Eleventh Circuit found that a genuine issue could be found whether the plaintiff had suffered a constitutional violation when she was abducted by two of the work squad inmates. The *Cornelius* court noted that the defendants had

"creat[ed] the dangerous situation of the inmates' presence ... around the town hall" and placed the plaintiff in the dangerous work environment as town clerk.

> The town officials contacted the prison to obtain inmate labor, accepted the inmates assigned to them and undertook to supervise the inmates while they worked. The defendants in this case therefore affirmatively created a potentially dangerous situation. This situation, combined with the culpable actions of the prison and town officials and the status of Mrs. Cornelius as the town clerk, effectively operated to place her in a position of danger distinct from that facing the public at large.

*Cornelius,* 880 F.2d at 357.

The case of *Estate of Sinthasomphone v. City of Milwaukee,* 785 F.Supp. 1343 (E.D.Wis.1992), involved a victim of Jeffrey Dahmer, who, after having been drugged and beaten by Dahmer, escaped naked into the streets of Milwaukee where two ladies attempted to help him. The police took Sinthasomphone from the two ladies, returned him to Dahmer, and threatened to arrest the two ladies if they continued to interfere. Dahmer subsequently confessed to having killed Sinthasomphone later that night and to murdering at least two others in the following months. The district court's opinion denying the defendants' motion to dismiss distinguished the action taken by the Milwaukee police from the failure to act in *DeShaney.*

> [Sinthasomphone] was then taken into what could be termed, at least, as brief police custody. During the time the police were in control, they prevented others from helping him. Then the police returned him to Dahmer's apartment.

*Estate of Sinthasomphone,* 785 F.Supp. at 1349. Larry Newsom was never taken into custody by the Greenwood police department.

In *Wood v. Ostrander,* 879 F.2d 583 (9th Cir.1989), the Ninth Circuit found a special relationship existed between the police and a passenger of an impounded vehicle.

> The fact that Ostrander arrested Bell, impounded his car, and apparently stranded Wood in a high-crime area at 2:30 a.m. distinguishes Wood from the general pub-

lic and triggers a duty of the police to afford her some measure of peace and safety.

*Id.* 879 F.2d at 590. The defendants had no contact with Larry Newsom which developed into a special relationship or distinguished him from the general public.

## II. Failure to Train

■ The plaintiff has sued the City of Greenwood and its chief of police, Austin Stanciel, who would be an official policymaker for Greenwood. For the plaintiff's failure to train claim to survive, she must raise a genuine issue of fact as to the existence of the following three elements:

> 1) the training procedure of the municipality's policymaker was inadequate; 2) the municipality's policymaker was deliberately indifferent in adopting the training policy; and 3) the inadequate training policy directly caused the plaintiff to suffer a constitutional violation.

*See Benavides v. County of Wilson,* 955 F.2d 968, 973 (5th Cir.1992); *Hinshaw v. Doffer,* 785 F.2d 1260, 1263 (5th Cir.1986).

The City of Greenwood had a written policy which stated:

> Any intoxicated person arrested will be placed in the appropriate drunk tank and kept there until sober. For purposes of his safety and the safety of others, an intoxicated person will not be permitted bond until sober.

Additionally, the police department appears to have evolved an understood custom of maintaining intoxicated individuals for a minimum of six hours. The plaintiff contends that inadequate training, which amounted to deliberate indifference, led to the police officers not following the policies which, if followed, would have prevented Larry's death.

■ Initially, the court notes that "failure to follow procedural guidelines standing alone, does not implicate constitutional liability." *Evans v. City of Marlin, Tex.,* 986 F.2d 104, 108 n. 6 (5th Cir.1993) *(citing Gagne v. City of Galveston,* 805 F.2d 558, 559–60 (5th Cir.1986) (qualified immunity not lost merely because "conduct violates some statutory or administrative provision." (quoting *Davis v.*

*Scherer*, 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984)). Failure to train police personnel can support § 1983 liability "only where the failure to train amounts to a deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388, 109 S.Ct. 1197, 1204, 103 L.Ed.2d 412 (1989). Even if the court assumes that the first element has been established, the plaintiff has failed to show the defendants' degree of inaction rose to this level of deliberate indifference. "[C]onclusory allegations of ... inadequate training do not make out a case of deliberately indifferent policy." *Benavides v. County of Wilson*, 955 F.2d at 973 (citations omitted).

■■■ For a police chief, who was not alleged to have been personally involved in the incident, to incur § 1983 liability "there must be a causal connection between an act of the police chief and the constitutional violation sought to be redressed." *Harvey v. Andrist*, 754 F.2d 569, 572 (5th Cir.1985). "[O]ur first inquiry in any case alleging municipal liability under § 1983 is the question whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *City of Canton*, 489 U.S. at 385, 109 S.Ct. at 1203. Allegations of inadequate training must be supported by evidence of a policy or custom which is the "moving force" of the constitutional violation. *Monell v. New York City Dept. of Soc. Ser.*, 436 U.S. 658, 694, 98 S.Ct. 2018, 2037–38, 56 L.Ed.2d 611 (1978). An isolated incident is insufficient to show that a policy or custom exists. *Palmer v. City of San Antonio*, 810 F.2d 514, 516 (5th Cir. 1987). Finally, negligent action does not support liability under § 1983. *Daniels v. Williams*, 474 U.S. 327, 338, 106 S.Ct. 662, 678, 88 L.Ed.2d 662 (1986); *Davidson v. Cannon*, 474 U.S. 344, 347, 106 S.Ct. 668, 670, 88 L.Ed.2d 677 (1986).

Even if the officers had been trained to perfection, the decision not to incarcerate Danilo is still within the individual discretion of the police officers. Hindsight has provided the plaintiff an opportunity to point an accusing finger at the police officers for not having incarcerated Danilo, but this court cannot say with certainty that the officers were negligent, much less that the training of the police was deliberately indifferent to the rights of the plaintiff. The court is unable to discern the causal connection between the failure to incarcerate Danilo and the shooting of Larry Newsom. The allegation of inadequate training is one step further removed, making any causal connection that much more tenuous. Additionally, if the police had maintained Danilo for six hours, this does not necessarily mean Larry Newsom would not have been shot upon the release of Danilo.

Finally, the plaintiff must raise a genuine issue of material fact as to whether the decedent suffered a violation of a constitutional right. *See City of Canton*, 489 U.S. at 385, 109 S.Ct. at 1202–03; *Collins v. City of Harker Heights, Tex.*, 916 F.2d 284, 287 (5th Cir.1990) (An abuse of government power "is in many ways similar to, and often blends with, other necessary elements for a § 1983 action, such as deprivation of a constitutional right ..."); *Evans*, 986 F.2d at 108. Deliberately indifferent action does not raise every injury from tort to constitutional violation. The plaintiff must have suffered a constitutional violation which is causally connected to a deliberately indifferent state actor in order to succeed in a failure to train lawsuit. Having previously held that the decedent and the plaintiff did not suffer a violation of a constitutional right, she cannot prove the failure to train claim, and accordingly, summary judgment is appropriate.

### III. State Law Claims

Plaintiff's remaining theory of liability is pursuant to Mississippi's wrongful death statute. This court has only supplemental jurisdiction over this claim because of its original jurisdiction over the plaintiff's § 1983 claims. *See* 28 U.S.C. § 1367(a). The statutory grant of jurisdiction is discretionary, even after the court no longer has original jurisdiction. Section 1367(c) provides:

The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if–

(3) the district court has dismissed all claims over which it has original jurisdiction, or

(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

If this court were to dismiss the plaintiff's state law claim for lack of jurisdiction, she would have to file her cause of action in a circuit court of the State of Mississippi. Although the parties have prepared for trial, there are presently pending before the court plaintiff's motions for a continuance and to reopen discovery. The court recognizes the tremendous time and expense incurred by the parties to date, but since sovereign immunity bars plaintiff's state law claim of wrongful death, it is appropriate to maintain supplemental jurisdiction in order to dispose of the plaintiff's state law claim on the merits in an expeditious manner.

■ The defendants allege that the plaintiff's wrongful death claim is barred by sovereign immunity. Mississippi's sovereign immunity has experienced a tremulous existence since the Mississippi Supreme Court decided *Pruett v. City of Rosedale*, 421 So.2d 1046 (Miss.1982), which abolished sovereign immunity. The Legislature of Mississippi quickly enacted a statutory law maintaining sovereign immunity as it existed prior to the *Pruett* decision. *See* Sovereign Immunity Act § 11–46–1 et seq. (Supp.1983). In *Presley v. Mississippi State Highway Com.*, 608 So.2d 1288 (Miss.1992), the Mississippi Supreme Court ruled the Sovereign Immunity Act (§ 11–46–1 et seq.) was unconstitutional. In special session, the Mississippi State Legislature enacted another sovereign immunity statute, which to date remains on the books.

The plaintiff's cause of action occurred or accrued on or about May 4, 1991, prior to the *Presley* decision. Of the five justices in the *Presley* majority finding § 11–46–1 et seq. unconstitutional, three of the justices gave the decision prospective application and two of them, in a concurring opinion, felt it should be applied retrospectively. In *Churchill v. Pearl River Basin Dev. Dist.*, 619 So.2d 900 (Miss.1993), the Mississippi Supreme Court determined that the only precedential weight that could be given to the *Presley* decision is its holding the Sovereign Immunity Act unconstitutional.

Most recently, the Mississippi Supreme Court, in *Morgan v. City of Ruleville*, 627 So.2d 275 (Miss.1993), held that membership in the Mississippi Municipal Liability Plan (MMLP), a "risk-sharing pool," did not waive sovereign immunity. The incident in *Morgan v. City of Ruleville*, occurred on May 30, 1987, after *Pruett* and prior to *Presley*. The *Morgan* court applied *Presley* prospectively. Since the *Morgan* decision held that sovereign immunity was not waived, then the Sovereign Immunity Act applicable at the time of the incidents giving rise to *Morgan*, although subsequently found unconstitutional in *Presley*, barred the plaintiff's cause of action. The case *sub judice*, rising under the same law as *Morgan*, is also barred by the doctrine of sovereign immunity.

■ Accordingly, the court finds the actions of the police officers, specifically the decision not to incarcerate Danilo, were discretionary matters, and thus defendants are immune from damages for any resulting tortious injuries. Additionally, sovereign immunity is not waived by the City of Greenwood being a member of the MMLP. *See McGee v. Parker*, 772 F.Supp. 308 (S.D.Miss.1991); *Morgan v. City of Ruleville*, 627 So.2d 275.

An order in accordance with this memorandum opinion shall be issued.

### ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

In accordance with a Memorandum Opinion issued contemporaneously, IT IS ORDERED:

That the defendants' motion for summary judgment is granted;

That the plaintiff's motion for continuance is moot and therefore denied; and

That the plaintiff's motion to reopen discovery is moot and therefore denied;

That this cause is hereby dismissed with prejudice.